UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————————————————
                                    )
BENJAMIN COLEMAN, through his       )
Conservator, ROBERT BUNN,           )
                                    )
            Plaintiff,              )
                                    ) Civil Action No. 13-1456 (EGS)
      v.                            )
                                    )
DISTRICT OF COLUMBIA,               )
                                    )
            Defendant.              )
———————————————————————)

**MEMORANDUM OPINION**

In the District of Columbia, as in many other jurisdictions, a homeowner who fails to pay property taxes runs a great risk. A delinquent property-tax bill becomes a lien, held by the District, on the homeowner's property. Continued failure to pay the delinquent tax bill creates the risk that the District will sell the property to satisfy the taxes. This practice of engaging in "tax sales" has long been recognized as a generally valid exercise of the government's power to collect taxes.

The devil, however, is in the details. In D.C., the tax-sale process begins with the sale at auction of a tax lien on the property to a third party. The homeowner may satisfy that lien by paying his delinquent tax bill, but the purchaser of the lien is able to add on top of that bill various costs, including attorney's fees. In Mr. Coleman's case, that caused what began

as a $133.88 tax bill to become a total of over $5,000, all of
which needed to be paid before the lien would be satisfied.

Once the lien is sold to the third party, a six-month waiting
period begins, during which the homeowner may redeem his home by
paying the taxes, along with any penalties, costs, and interest
that are owed. If the entire bill is not paid upon expiration of
the waiting period, the tax-lien purchaser may initiate
proceedings in the Superior Court of the District of Columbia to
foreclose. The Superior Court is empowered to enter a judgment
vesting a fee simple title in the property in the tax-lien
purchaser. In this way, a small sum paid to purchase the lien
becomes full title to a property worth hundreds of thousands of
dollars (in this case, approximately $200,000). The key detail
in this case is that D.C. law provides that any surplus equity
the homeowner has in his home is irrevocably lost, no matter how
small the tax bill nor how valuable the equity.

Mr. Coleman brings a limited challenge to this law. He does
not seek to regain his home, does not dispute that the District
may use tax sales to satisfy delinquent property taxes, and
agrees with the District that he owed $133.88 in property taxes,
plus penalties, costs, and interest. Mr. Coleman's claim is
against the District's taking of the entire equity in his home.
The District, he asserts, has provided him no compensation for

the loss of that equity, even though its value far exceeds the taxes, penalties, costs, and interest he owed.

Mr. Coleman claims that such a practice is forbidden by the Takings Clause of the Fifth Amendment to the United States Constitution. Accordingly, he filed suit seeking an award of "just compensation," as well as a declaration from this Court that the District's statute is unconstitutional. The District has moved to dismiss Mr. Coleman's Complaint, arguing that this Court lacks jurisdiction for multiple reasons and that, in any event, Supreme Court precedent holds that the District's actions do not violate the Takings Clause. The Court has considered the District's motion, the response and reply thereto, as well as the applicable law and the entire record in this case. The Court also held a hearing on the motion to dismiss on September 26, 2014. The Court finds that it has jurisdiction over Mr. Coleman's claims and accordingly rejects all of the District's jurisdictional arguments. The Court also rejects the District's argument that prior Supreme Court precedent has foreclosed Mr. Coleman's claim under the Takings Clause. Accordingly, the Court **DENIES** the District's motion.

## I.   Background

### A.   Statutory Background

The District of Columbia's laws governing the procedure for collecting delinquent property taxes are codified in Chapter 13A

of title 47 of the D.C. Code. *See* Revised Real Property Tax Sales, D.C. Code § 47-1330, *et seq.* On the day that a tax—defined as "unpaid real property tax . . . including penalties, interest, and costs," *id.* § 47-1330(2)—becomes delinquent, the D.C. Code declares that it "shall automatically become a lien on the real property." *Id.* § 47-1331(a). The Code further directs the District to "sell all real property on which the tax is in arrears unless otherwise provided by law." *Id.* § 47-1332(a).

Such tax sales follow a procedure set out elsewhere in the statute. "At least 30 days before" any such sale is to be advertised, "the Mayor shall mail to the person who last appears as owner of the real property on the tax roll . . . a notice of delinquency." *Id.* § 47-1341(a). Once thirty days have passed "from the mailing of the notice of delinquency," the District must advertise that the property "will be sold at public auction because of taxes." *Id.* § 47-1342(a). At this public sale, the District must sell the property "in its entirety," *id.* § 47-1343, "to the purchaser who makes the highest bid." *Id.* § 47-1346(a)(2). Sales are not to be conducted "for less than the amount of the taxes," however. *Id.* § 47-1346(c).

The purchaser receives "a certificate of sale," which describes the property and the sale, and indicates "[t]he amount of taxes for which the real property was offered for sale." *Id.* § 47-1348(a). The six months following the date of sale are a

4

redemption period, during which the purchaser may not foreclose the original owner's right to redeem the property. *Id.* § 47-1370(a). The original owner may redeem by paying to the District "the amount paid by the purchaser . . . exclusive of surplus with interest thereon," as well as "other taxes, interest, and penalties paid by a purchaser," and "expenses for which the purchaser is entitled to reimbursement." *Id.* § 47-1361(a). Interest on this amount is calculated at an annual rate of 18%. *Id.* §§ 47-1334, 47-1361, 47-1377. If the original owner makes sufficient payments to the District, the purchaser of the certificate of sale "shall receive a refund of the payment" with interest. *Id.* § 47-1354(b).

Once the six-month redemption period has passed, "a purchaser may file a complaint to foreclose the right of redemption of the real property." *Id.* § 47-1370(a). This action must be filed within one year of the date of sale of the lien, or the certificate of sale becomes void. *See id.* § 47-1355(a)(1). Even if such an action is pending, the original owner "may redeem the real property at any time until the foreclosure of the right of redemption is final." *Id.* § 47-1360. In adjudicating an action to foreclose the right of redemption, the Superior Court may "[v]est title in fee simple in the purchaser." *Id.* § 47-1370(b)(2). The purchaser of the tax-sale certificate must bring the action against the original owner of the property and the

District of Columbia, as well as any entity with a particular interest in the property. *See id.* § 47-1371(b)(1). The law permits the Superior Court to issue a final judgment "foreclosing the right of redemption," which bars the original owner from redeeming the property and vests in the purchaser a deed in fee simple. *See id.* § 47-1382(a). In doing so, the law permits the taking of not only the amount of delinquent taxes, plus any costs, fees, and interest, but also the entirety of the original owner's equity in the property.[1]

### B.   Factual Background

Benjamin Coleman is a 76-year-old veteran. Compl., ECF No. 1 ¶ 26. At all times relevant to this case, he "suffered from severe dementia," *id.* ¶ 27, and this action is brought on Mr. Coleman's behalf by Robert Bunn, his guardian who was appointed by the Superior Court "to manage Mr. Coleman's legal and financial affairs." *Id.* ¶ 15.

In 2006, Mr. Coleman failed to pay a $133.88 property tax bill on his home. *Id.* ¶ 28. The District placed a tax lien on Mr. Coleman's home and added $183.47 in penalties to his preexisting

---

[1] The Court notes that subsequent legislation by the Council of the District of Columbia will alter the process in many ways. Most importantly, legislation that is scheduled to take effect in October 2014 grants homeowners whose homes are sold at tax auction and subsequently foreclosed upon a right to recover a substantial portion of the equity they had in their homes. *See* Residential Real Property Equity and Transparency Act, 62-31 D.C. Reg. 7763 (Aug. 1, 2014).

tax obligation. *Id.* ¶ 29. The lien—of $317.35—was offered for sale at a public auction in July 2007, when it was sold to Embassy Tax Services, LLC ("Embassy"). *Id.* ¶ 30.

Embassy filed an action to foreclose Mr. Coleman's right of redemption on February 28, 2008. *Id.* ¶ 33. It demanded $4,999 in addition to the lien amount of $317.35 from Mr. Coleman. *Id.* ¶ 34. The additional amount was for "court costs, attorney's fees, expenses incurred for personal service of process, expenses incurred for service of process by publication and fees for the title search." *Id.* Embassy filed the action against Mr. Coleman, as well as the District, although the District "did not file any specific claims or defenses." *Id.* ¶ 35.

On September 24, 2008, Mr. Coleman's son sent a handwritten letter to the Superior Court indicating "that he had recently moved back into town and had discovered that his father was 'living alone and had not kept to his medicine.'" *Id.* ¶ 37. Mr. Coleman's son "offered to 'get most of the payments in on Oct. 3, 2008.'" *Id.* The Superior Court ultimately held a status hearing on March 11, 2009, after which it gave Mr. Coleman until May 27, 2009 to complete his payments. *Id.* ¶¶ 38–39.

On May 26, 2009, Mr. Coleman's son sent another letter to the Superior Court, noting "that his father had 'been under the weather,' but that his father had paid all of the owed taxes." *Id.* ¶ 40. Mr. Coleman's son also "offered for his father to make

monthly payments of $850 beginning June 1, 2009" to satisfy the additional obligations to Embassy. *Id.* When no one appeared for Mr. Coleman at the May 27, 2009 status hearing, the Court tried, unsuccessfully, to contact his son. *See id.* ¶ 41. The Court then adopted the proposed payment schedule, stayed the deadline for Mr. Coleman to redeem his property, and directed Mr. Coleman and his son to appear for a June 24, 2009 hearing. *Id.* That hearing was rescheduled on multiple occasions. *Id.* ¶ 42.

On March 31, 2010, Embassy moved for a default judgment, noting "Mr. Coleman's failure to appear, file a responsive pleading or file a notice of interest in the property." *Id.* ¶ 43. The Superior Court granted the motion for a default judgment on June 11, 2010 and issued a judgment "extinguishing any title, rights, claims and interests that Mr. Coleman had in the property." *Id.* ¶¶ 44-45. The District of Columbia executed a deed to Embassy on August 31, 2010. *See id.* ¶ 46. The home at that time "had a fair market value of approximately $200,000." *Id.*

On December 16, 2010, Embassy filed with the Superior Court a petition for writ of possession because Mr. Coleman continued to reside in his home. *Id.* ¶ 47. On June 9, 2011, Embassy filed a complaint with the Superior Court's Landlord-Tenant Branch and obtained a default judgment on June 22, 2011. *Id.* ¶¶ 48-49. Mr. Coleman was evicted on August 5, 2011. *Id.* ¶ 50. Embassy sold

his home for $71,000 in October of 2011. *Id.* ¶ 51. He continues

to reside in D.C, but "now lives in a group home, a mile from

his former house." *Id.* ¶¶ 15, 52.

### C.   Procedural History

On September 24, 2013, Mr. Coleman brought this lawsuit

against the District of Columbia. *See* Compl., ECF No. 1. He

alleges that the District's tax-sale statute violates the

Takings Clause of the Fifth Amendment to the United States

Constitution by taking a homeowner's surplus equity and

transferring it to a private party without just compensation or

public purpose. *Id.* ¶¶ 2, 7. Mr. Coleman brings a three-count

Complaint against the District. Count One seeks damages under 42

U.S.C. § 1983. *See id.* ¶¶ 70–78. Count Two seeks "just

compensation" under the Fifth Amendment. *See id.* ¶¶ 79–86. Count

Three seeks a declaratory judgment that the provisions of D.C.

law "causing the sale of a home and all of its equity to a third

party are null and void as a violation of the Fifth Amendment."

*Id.* ¶¶ 87–90.

On October 18, 2013, the District moved to dismiss. *See* Def.'s

Mot. to Dismiss ("Mot."), ECF No. 5. Mr. Coleman filed his

opposition on November 22, 2013. *See* Pl.'s Opp. to Mot. to

Dismiss ("Opp."), ECF No. 8. The District filed its reply in

further support of its motion on December 6, 2013. *See* Def.'s

Reply in Supp. of Mot. to Dismiss ("Reply"), ECF No. 10. The

Court held a hearing on the motion to dismiss on September 26, 2014. The motion is now ripe for the Court's decision.

## II.   Standard of Review

### A.   Rule 12(b)(1)

A federal district court may only hear a claim over which it has subject matter jurisdiction; therefore, a Rule 12(b)(1) motion for dismissal is a threshold challenge to a court's jurisdiction. On a motion to dismiss for lack of subject matter jurisdiction, the plaintiff bears the burden of establishing that the Court has jurisdiction. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). In evaluating the motion, the Court must accept all of the factual allegations in the complaint as true and give the plaintiff the benefit of all inferences that can be drawn from the facts alleged. *See Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005). However, the Court is "not required . . . to accept inferences unsupported by the facts alleged or legal conclusions that are cast as factual allegations." *Cartwright Int'l Van Lines, Inc. v. Doan*, 525 F. Supp. 2d 187, 193 (D.D.C. 2007) (quotation marks omitted).

### B.   Rule 12(b)(6)

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a complaint." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). A complaint must contain "a short and plain statement of the claim showing that

the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quotation marks and alteration omitted). While detailed factual allegations are not necessary, a plaintiff must plead enough facts "to raise a right to relief above the speculative level." *Id.*

When ruling on a Rule 12(b)(6) motion, the court may consider "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002). The Court must construe the complaint liberally in plaintiff's favor and grant plaintiff the benefit of all reasonable inferences deriving from the complaint. *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). The Court must not accept inferences that are "unsupported by the facts set out in the complaint." *Id.* "Nor must the court accept legal conclusions cast in the form of factual allegations." *Id.* "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)

## III. Analysis

### A.   The Court Has Jurisdiction Over Mr. Coleman's Claims.

The District argues that the Court lacks jurisdiction to hear Mr. Coleman's claims for four distinct reasons: (1) Counts One and Three of the Complaint are barred by the federal and D.C. Tax Injunction Acts, 28 U.S.C. § 1341 and D.C. Code § 47-3307, as well as the related principle of comity; (2) Count Two of the Complaint is not ripe for resolution; (3) the case is precluded by the *Rooker-Feldman* doctrine; and (4) the case is barred by the doctrine of *res judicata*.

1.    *The Tax Injunction Act*

The District's first jurisdictional argument is that Counts One and Three of Mr. Coleman's Complaint—which seek damages for the loss of surplus equity and a declaratory judgment that the relevant provisions of the D.C. Code are unconstitutional— challenge the legality of the District of Columbia's system for collecting property taxes in violation of the Tax Injunction Act, 28 U.S.C. § 1341, and the related principle of comity, as well as the D.C. Tax Injunction Act, D.C. Code § 47-3307. Mr. Coleman claims that Counts One and Three do not challenge the District's collection of property taxes at all, but instead are addressed at the separate taking of a homeowner's surplus equity. *See* Opp. at 26-29.

The Tax Injunction Act declares that "[t]he district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and

efficient remedy may be had in the courts of such State." 28 U.S.C. § 1341.[2] The Act has been interpreted to bar not only injunctions, but also actions seeking declaratory judgments regarding the validity of tax collection. *See Great Lakes Dredge & Dock Co. v. Huffman*, 319 U.S. 293, 299 (1943). Moreover, "[a]lthough the Supreme Court has not decided whether the Act itself covers damages suits under 42 U.S.C. § 1983, the Supreme Court has found 'that taxpayers are barred by the principle of comity from asserting § 1983 actions against the validity of state tax systems in federal courts.'" *Dist. Lock & Hardware, Inc. v. District of Columbia*, 808 F. Supp. 2d 36, 39 (D.D.C. 2011) (quoting *Fair Assessment in Real Estate Ass'n v. McNary*, 454 U.S. 100, 116 (1981) (quotation marks, citations, and alterations omitted).

The Act is "first and foremost a vehicle to limit drastically federal district court jurisdiction to interfere with so important a local concern as the collection of taxes." *Rosewell v. LaSalle Nat'l Bank*, 450 U.S. 503, 522 (1981). This is not to say that the Act bars any lawsuit that relates to tax collection, however. As the Supreme Court recently held, the Act

---

[2] Similarly, the D.C. Tax Injunction Act provides: "No suit shall be filed to enjoin the assessment or collection by the District of Columbia or any of its officers, agents, or employees of any tax." D.C. Code § 47-3307.

reflects "two closely related, state-revenue-protective

objectives":

> (1) to eliminate disparities between taxpayers who
> could seek injunctive relief in federal court—usually
> out-of-state corporations asserting diversity
> jurisdiction—and taxpayers with recourse only to state
> courts, which generally required taxpayers to pay
> first and litigate later; and

> (2) to stop taxpayers, with the aid of a federal
> injunction, from withholding large sums, thereby
> disrupting state government finances."

*Hibbs v. Winn*, 542 U.S. 88, 104 (2004).

In *Hibbs*, the Supreme Court articulated the narrow scope of

claims that are subject to the Act, holding that it does not bar

claims that relate generally to "state tax administration";

rather, the relief sought must disrupt "the collection of

revenue" by "operat[ing] to reduce the flow of state tax

revenue." *Id.* at 105, 106. Upon reviewing the Act's history, the

Supreme Court concluded that "Congress trained its attention on

taxpayers who sought to avoid paying their tax bill by pursuing

a challenge route other than the one specified by the taxing

authority. Nowhere does the legislative history announce a

sweeping congressional direction to prevent federal-court

interference with all aspects of state tax administration." *Id.*

at 104–05 (quotation marks omitted). "In sum, this Court has

interpreted and applied the [Tax Injunction Act] only in cases

Congress wrote the Act to address, *i.e.*, cases in which state

taxpayers seek federal-court orders enabling them to avoid paying state taxes." *Id.* at 107.

Courts have consistently applied the language of *Hibbs* that the Tax Injunction Act bars only claims "'in which state taxpayers seek federal-court orders enabling them to *avoid paying state taxes*,'" *BellSouth Telecomms. v. Farris*, 542 F.3d 499, 501 (6th Cir. 2008) (quoting *Hibbs*, 542 U.S. at 107) (emphasis in original), or, phrased slightly differently, that the Act applies only "to a lawsuit when the relief granted by a federal court will 'operate to reduce the flow *of state tax revenue*.'" *Okla. ex rel. Okla. Tax Comm'n v. Int'l Reg. Plan, Inc.*, 455 F.3d 1107, 1112 (10th Cir. 2006) (quoting *Hibbs*, 542 U.S. at 106) (emphasis added); *see also Luessenhop v. Clinton Cnty.*, 466 F.3d 259, 266 (2d Cir. 2006); *May Trucking Co. v. Or. Dep't of Transp.*, 388 F.3d 1261, 1267 (9th Cir. 2004).

Mr. Coleman does not seek a court order nullifying his property tax obligation. Indeed, the District conceded at oral argument that a ruling in Mr. Coleman's favor would not allow him to avoid paying any tax. Mr. Coleman further notes that the D.C. Code provision at issue defines "tax" narrowly, to encompass "unpaid real property tax . . . including penalties, interest, and costs." D.C. Code § 47-1330(2). Mr. Coleman concedes that those amounts were due; he seeks only the surplus equity that remains after those amounts are paid. Accordingly,

if Mr. Coleman won this lawsuit, no "tax" would be removed from the District's coffers. For that reason, the Tax Injunction Act does not bar his claims.

The District argues that Mr. Coleman's claims must nonetheless be dismissed because their success would frustrate the "collection" of taxes by holding the process by which the District collects property taxes unconstitutional. *See* Mot. at 10-11. Under the District's view, the law's treatment of a homeowner's surplus equity is inextricably intertwined with the process by which a tax lien is sold to a third party and a former homeowner's right to redeem the property itself is foreclosed upon. In essence, forfeiting the equity is an extra incentive for the payment of taxes.

Courts have rejected the argument that the Tax Injunction Act bars challenges to such independent incentives. Indeed, the Supreme Court in *Hibbs* discussed such a case, Judge Friendly's decision in *Wells v. Malloy*, 510 F.2d 74 (2d Cir. 1975). *See Hibbs*, 542 U.S. at 109. In *Wells*, the plaintiff had failed to pay a state motor-vehicle tax and, as a consequence, the state suspended his driver's license. *See* 510 F.2d at 76. The plaintiff brought a suit contesting the constitutionality of that action, but "did not dispute that the tax was due and owing." *Id.* Judge Friendly held that the plaintiff "[c]learly . . . is not seeking to restrain the 'assessment' or 'levy' of a

tax under state law." *Id.* at 77. The state argued that the
plaintiff sought to restrain the "collection" of taxes, but
Judge Friendly rejected a reading of that word "to include
anything that a state has determined to be a likely method of
securing payment." *Id.* In using the word "collection":

> Congress was referring to methods similar to
> assessment and levy, e.g., distress or execution, that
> would produce money or other property directly, rather
> than indirectly through a more general use of coercive
> power. Congress was thinking of cases where taxpayers
> were repeatedly using the federal courts to raise
> questions of state or federal law going to the
> validity of the particular taxes imposed upon them—not
> to a case where a taxpayer contended that an unusual
> sanction for non-payment of a tax admittedly due
> violated his constitutional rights, an issue which,
> once determined, would be determined for him and all
> others.

*Id.* (citations omitted). The plaintiff in *Wells* was thus not
barred by the Tax Injunction Act. *See id.* For similar reasons,
Mr. Coleman's challenge to the District's taking of the surplus
equity in his home, above and beyond the amounts the District
has defined as the "tax," is not barred by the Tax Injunction
Act.[3]

---

[3] The Court need not resolve the dispute over whether a challenge
to the adequacy of a foreclosure notice in the context of a tax
sale is barred by the Tax Injunction Act. *Compare Luessenhop*,
466 F.3d at 260–61 (Second Circuit holding that the "collection"
of taxes was not at issue where "[n]one of the plaintiffs
dispute[d] the authority of the governmental body to collect the
taxes due . . . . Neither d[id] they contest the assessments of
their property, or the amount of taxes claimed due"), *and Burns
v. Conley*, 526 F. Supp. 2d 235, 241 (D.R.I. 2007) (plaintiffs'
challenge to the adequacy of notice of a pending tax sale was

The District finds superficial support for its position in a handful of decisions that concluded that challenges to the legality of a tax sale itself, which sought to recover the taxes that were paid, are barred by the Tax Injunction Act. These decisions are easily distinguished. Most prominently, the District cites *Wright v. Pappas*, 256 F.3d 635 (7th Cir. 2001), where a purchaser of tax liens brought suit alleging that the county from which he purchased the liens had misrepresented the values of the relevant properties for racially discriminatory reasons. *See id*. at 636. The plaintiff sought a "refund [of] the price he paid for the certificates." *Id*. The Seventh Circuit held that "[a] lien sale is a mode of tax collection; and so an action to enjoin it, or declare it illegal, or rescind it, or perhaps even just obtain damages on the ground of its illegality, would be barred." *Id*. at 637. The plaintiff was barred by the Tax Injunction Act because he "challenge[d] the mode of collection," and he sought a refund of the purchase

---

not barred by the Tax Injunction Act where the plaintiffs "do not challenge the power of the town to levy sewer assessments and to conduct tax sales; they would have paid the taxes had they received notice"), *with Dist. Lock & Hardware*, 808 F. Supp. 2d at 41-42 (challenge to adequacy of notice or a tax sale was barred by the Act because it sought "to set aside of undo the sale" and was thus a challenge to the "collection" of taxes). A claim regarding the adequacy of notice of a tax sale challenges an action that, arguably, is part of the tax sale itself. *See Dist. Lock & Hardware*, 808 F. Supp. 2d at 41-42. Mr. Coleman challenges nothing in the tax sale; rather, he argues that the independent statutory taking of his surplus equity was unlawful.

price he paid, which was the functional equivalent of the tax payment. *See id.*

Wright does not affect Mr. Coleman's claims because Mr. Coleman "does not challenge the District's right to collect the tax owed; the amount of the tax, interest, expenses or penalties owed; or the right of the District's taxing authorities to foreclose on his property to recover that debt." Opp. at 27. All he challenges is "the taking of property that was indisputably *not* owed for taxes . . . the amount in excess of the tax owed." *Id.* Unlike the plaintiff in *Wright*, then, Mr. Coleman neither seeks to recover any tax that was paid (he concedes its validity), nor to "enjoin," "declare . . . illegal," "rescind," or "obtain damages on the grounds of . . . illegality" of the tax sale. *Wright*, 256 F.3d at 637.[4]

---

[4] For similar reasons, other cases cited by the District are distinct. *See Schulz v. Williamson*, 145 F. App'x 704, 704 (2d Cir. 2005) (Tax Injunction Act barred action where the plaintiffs "sought to enjoin defendants from enforcing state tax laws by adding their names to a list of delinquent taxpayers or foreclosing on their real property"); *Miller v. District of Columbia*, No. 06-1935, 2007 WL 1748890, at *3-4 (D.D.C. June 18, 2007) (concluding that the Tax Injunction Act deprives the Court of "subject-matter jurisdiction over plaintiffs' challenge to the sale of his properties at a tax auction and over his related request that the tax sale be 'set aside'"); *Dixon v. Oisten*, No. 02-CV-72379, 2002 WL 31008840, at *3-4 (E.D. Mich. Aug. 20, 2002) (Tax Injunction Act barred an action when the plaintiff sought "to either redeem his property or properties or to set aside the tax sale"), *aff'd*, 62 F. App'x 105 (6th Cir. 2003); *United States v. Boyce*, 153 F. Supp. 2d 1194, 1196 (S.D. Cal. 2001) (finding that a federal district court "is not the proper

2.   *Ripeness*

The District's second jurisdictional argument maintains that Count II of plaintiff's Complaint, which seeks an award of just compensation under the Takings Clause, "is premature" under the ripeness requirement inherent in all Takings Clause claims. *See* Mot. at 12. For a Takings Clause claim to be ripe for judicial resolution, the plaintiff must show that: (1) "the government entity charged with implementing the regulations has reached a final decision"; and (2) the plaintiff has sought "compensation through the procedures the State has provided," which must be "reasonable, certain and adequate . . . at the time of the taking." *Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 186, 194 (1985); *see also* 13B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3532.1.1 (3d ed. 2014) ("There must be a final decision to 'take,' and the plaintiff must show that there is no other remedy to provide adequate compensation."). The District does not contest that there has been a final decision, and argues only that Mr. Coleman has not pursued available state remedies.

The requirement that a plaintiff exhaust state compensation remedies exists because "[t]he Fifth Amendment does not proscribe the taking of property; it proscribes taking without

---

[forum] for any challenge . . . regarding the validity of the [State Franchise Tax Board's] tax liens").

just compensation." *Williamson*, 473 U.S. at 194. Accordingly, "the State's action is not complete in the sense of causing a constitutional injury unless or until the State fails to provide an adequate postdeprivation remedy for the property loss." *Id.* at 195 (quotation marks omitted). The Supreme Court therefore found a takings claim unripe where state statutory law permitted "a property owner [to] bring an inverse condemnation action to obtain just compensation for an alleged taking of property." *Id.* at 196.

The analysis looks to potential "remedies under state *substantive* law." 13B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3532.1 n.43 (3d ed. 2014) (emphasis added). In the absence of any such remedy, a plaintiff may immediately bring his claim in federal court. *See, e.g.*, *Arnett v. Myers*, 281 F.3d 552, 564 (6th Cir. 2002) (takings claim was ripe where "[t]his court's review of Tennessee law has revealed no reasonable, certain, and adequate provision for obtaining just compensation that was available . . . at the time of the alleged takings in this case"); *Clajon Prod. Corp. v. Petera*, 70 F.3d 1566, 1575 (10th Cir. 1995) (where a state inverse-condemnation action was available only against government entities with "the power to condemn land," and the challenged government entity "lacks the power of eminent domain" meaning that it was "not subject to Wyoming's inverse

condemnation procedure, Plaintiffs' takings claim is ripe for review"); *Hoehne v. Cnty. of San Benito*, 870 F.2d 529, 533 (9th Cir. 1989) (in an action alleging a taking in connection with the denial of a subdivision application, claim was ripe because at the time of the denial "California law prohibited actions seeking just compensation as a remedy for regulatory takings").

A plaintiff cannot ignore potential sources of state remedies, however. Where, for example, a state constitution contains its own takings clause, courts have required plaintiffs to bring a claim under that provision first, even if the availability of just compensation has not been clearly established. *See, e.g.*, *Pascoag Reservoir & Dam, LLC v. Rhode Island*, 337 F.3d 87, 93 (1st Cir. 2003) ("The Rhode Island Constitution prohibits the taking of private property for public use without just compensation and Rhode Island state courts have long allowed recovery through suits for inverse condemnation."); *Southview Assocs., Ltd. v. Bongartz*, 980 F.2d 84, 100 (2d Cir. 1992) (holding that the Vermont Constitution "recognizes a cause of action for a taking generally, even if it has yet to decide whether recovery can be had for a regulatory taking," meaning that the plaintiff must first pursue such a claim); *Austin v. City & Cnty. of Honolulu*, 840 F.2d 678, 681 (9th Cir. 1988) (same under the Hawaii Constitution). Similarly, where a state's supreme court has indicated that inverse-condemnation is

available as a separate substantive claim, plaintiffs must first
bring such a claim even if its contours are unclear. *See, e.g.*,
*Culebras Enters. Corp. v. Rivera Rios*, 813 F.2d 506, 513 (1st
Cir. 1987) (court decisions had indicated that the court "will
entertain an inverse condemnation action for damages when it
believes that property is 'taken' by unconstitutionally
excessive governmental regulations," although damages had never
been awarded under the action); *Littlefield v. City of Afton*,
785 F.2d 596, 609 (8th Cir. 1986) (court had indicated that an
inverse-condemnation action existed, although it was limited "to
cases where an injunction would not restore plaintiffs to their
original status").

  The District argues that "[l]andowners can bring an inverse
condemnation action in the District of Columbia" and that Mr.
Coleman's failure to do so renders Count II of his Complaint
unripe. *See* Mot. at 12. Mr. Coleman correctly notes that the
sole citation provided by the District in support of its
argument that such a substantive claim exists is a reference to
the term "inverse condemnation" in a D.C. Court of Appeals
opinion which addressed only a federal Takings Clause claim
brought pursuant to 42 U.S.C. § 1983. *See Potomac Dev. Corp. v.
District of Columbia*, 28 A.3d 531, 550-51 & n.9 (D.C. 2011). In
that decision, the D.C. Court of Appeals emphasized that
"District law is not the basis of the cause of action pled in

the complaint, which invokes only § 1983." *Id.* at 550. The Court noted that "earlier inverse condemnation cases applied Fifth Amendment principles in deciding whether a taking has occurred and what compensation is just," and the two cases cited by the D.C. Court of Appeals appear also to have relied on the Fifth Amendment. *See Mamo v. District of Columbia*, 934 A.2d 376, 378, 384–85 (D.C. 2007); *D.C. Redev. Land Agency v. Dowdey*, 618 A.2d 153, 164 (D.C. 1992). The D.C. Court of Appeals, therefore, has provided no basis to infer the existence of an independent inverse-condemnation action under D.C. law.

The possibility that a court could fashion such an action is not sufficient to render Mr. Coleman's claim unripe. *See Culebras*, 813 F.2d at 513 (state supreme court had indicated that it would entertain such an action under certain circumstances); *Littlefield*, 785 F.2d at 609 (same). Nor has the District identified any other potential source of a remedy. In fact, it conceded at oral argument that it presented no other legal authority. The Court finds no basis to infer the existence of such a remedy, either. The District does not have a constitution—a common source for a state substantive remedy. *See Pascoag*, 337 F.3d at 93; *Southview*, 980 F.2d at 100; *Austin*, 840 F.2d at 681. Further, the statute at issue in this case expressly provides for the taking of plaintiff's surplus equity and contains no procedure for the recovery of that surplus.

Accordingly, because there is no "reasonable, certain, and adequate" state remedy, *Williamson*, 473 U.S. at 194, Mr. Coleman's claim is ripe for resolution.[5]

> 3.   *Rooker-Feldman*

The District's third jurisdictional argument is that Mr. Coleman's case constitutes an unacceptable request that this Court "review a judicial decision of the D.C. Superior Court, and . . . adjudicate claims that are a direct result of the 2010 Foreclosure Judgment." Mot. at 13. Mr. Coleman counters that he has no objection to the Foreclosure Judgment and does not seek to overturn that judgment or recover title to his property; rather, his objection is to the District's independent taking of his surplus equity. *See* Opp. at 36–39.

This argument implicates the *Rooker-Feldman* doctrine, which "'prevents lower federal courts from hearing cases that amount to the functional equivalent of an appeal from a state court.'" *Magritz v. Ozaukee Cnty.*, 894 F. Supp. 2d 34, 38 (D.D.C. 2012)

---

[5] Although the District appeared to argue in its pleadings that Mr. Coleman must litigate his federal claim in the Superior Court before that claim may become ripe for review in federal court, Reply at 8–10, the District conceded during oral argument that this is not the case. This concession was appropriate, as it is hornbook law that plaintiffs need only resort to existing "remedies under state substantive law" and that their federal claims "need not be presented to state courts." 13B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3532.1 n.43 (3d ed. 2014); *see also, e.g.*, *Front Royal & Warren Cnty. Indus. Park Corp. v. Town of Front Royal*, 135 F.3d 275, 283 (4th Cir. 1998); *Dodd v. Hood River Cnty.*, 59 F.3d 852, 860–61 (9th Cir. 1995).

(quoting *Gray v. Poole,* 275 F.3d 1113, 1119 (D.C. Cir. 2002)). The *Rooker-Feldman* doctrine "is based on the jurisdictional grant codified in 28 U.S.C. § 1257, which authorizes only the Supreme Court to exercise appellate jurisdiction over state court judgments." *Liebman v. Deutsche Bank Nat'l Trust Co.*, No. 13-1392, 2014 WL 526712, at *3 (D.D.C. Feb. 11, 2014).

The doctrine began in a 1923 case in which a plaintiff sought "to have a judgment of a circuit court in Indiana, which was affirmed by the Supreme Court of the state, declared null and void, and to obtain other relief dependent on that outcome." *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 414 (1923). The Supreme Court found that the plaintiffs' request was "plainly not within the District Court's jurisdiction as defined by Congress." *Id.* at 415.

The Supreme Court revisited the doctrine in 1983 when two individuals challenged the D.C. Court of Appeals' denial of their bar applications pursuant to a rule that all applicants must prove that they graduated from an approved law school. *See D.C. Court of Appeals v. Feldman*, 460 U.S. 462, 463-65 (1983). The Supreme Court held that the Court of Appeals' consideration and denial of the plaintiffs' applications was "judicial in nature" and thus could not be reviewed in the district court. *See id.* at 479-82. The Court held that the district court also lacked jurisdiction over plaintiffs' challenges to the Court of

Appeals' denial of their "petitions for waiver" of the rule, which relied on an alleged "former policy of granting waivers," because those decisions were "inextricably intertwined with the District of Columbia Court of Appeals' decisions, in judicial proceedings, to deny the respondents' petitions." *Id.* at 486–87. The Supreme Court went on to hold, however, that "[t]o the extent that [plaintiffs] mounted a general challenge to the constitutionality of [the Court of Appeals' rule requiring that applicants prove they had graduated from an approved law school] the District Court did have subject matter jurisdiction over their complaints." *Id.* at 482–83.

In 2005, the Supreme Court clarified that *Rooker-Feldman* is a limited doctrine that "is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). *Rooker-Feldman* does not "stop a district court from exercising subject-matter jurisdiction simply because a party attempts to litigate in federal court a matter previously litigated in state court," even if "a federal plaintiff presents some independent claim . . . that denies a legal conclusion that a state court has reached in a case to

which he was a party." *Id.* at 293 (quotation marks and alteration omitted).

The use in *Feldman* of the phrase "inextricably intertwined" had created some definitional problems, but *Exxon* clarified that issue as well. The phrase was intended to mean only "that a district-court challenge to [a state-court decision] would be barred even if the challenge was based on a ground not raised in the [state-court] proceeding." *Campbell v. City of Spencer*, 682 F.3d 1278, 1282 (10th Cir. 2012). Accordingly, "[w]hen the state-court judgment is not itself at issue, the *Rooker-Feldman* doctrine does not prohibit federal suits regarding the same subject matter, or even the same claims, as those presented in the state-court action," nor does it "bar an action just because it seeks relief inconsistent with, or even ameliorative of, a state-court judgment." *Campbell*, 682 F.3d at 1281 (quotation marks and alteration omitted). "The essential point is that barred claims are those complaining of injuries caused by state-court judgments. In other words, an element of the claim must be that the state court wrongfully entered its judgment." *Id*. at 1283 (quotation marks omitted).

"In assessing the applicability of the *Rooker-Feldman* doctrine . . . the fundamental and appropriate question to ask is whether the injury alleged by the federal plaintiff resulted from the state court judgment or is distinct from that judgment." *Long v.*

*Shorebank Dev. Corp.*, 182 F.3d 548, 555 (7th Cir. 1999)
(quotation marks omitted). In conducting this inquiry, "federal
courts cannot simply compare the *issues* involved in the state-
court proceeding to those raised in the federal-court
plaintiff's complaint, but instead must pay close attention to
the *relief* sought by the federal-court plaintiff." *Exec. Arts
Studio v. City of Grand Rapids*, 391 F.3d 783, 793–94 (6th Cir.
2004) (quotation marks omitted; emphases in original).

Here, the dispute centers on how Mr. Coleman's claims are
characterized. To the District, he attacks directly the 2010
Foreclosure Judgment, making this a clear attempt to obtain
review of a state-court judgment. Even though Mr. Coleman's
Takings Clause argument was not addressed in the 2010
proceedings, if he sought to have that judgment overturned in
this Court, he would be barred by *Rooker-Feldman*. Indeed, the
District rightly notes that direct attacks on state-court
foreclosure judgments are barred by *Rooker-Feldman*. *See, e.g.*,
*Magritz*, 894 F. Supp. 2d at 38–39 (plaintiff's challenge to the
tax sale of his property was barred by *Rooker-Feldman* because he
directly "question[ed] the validity of the underlying 2001
Judgment of Foreclosure").

The plaintiff contends that his claim is more nuanced than the
District presents. "Mr. Coleman does not seek review or
rejection in this case of the Superior Court judgment entered in

favor of Embassy Tax Services and against him," he "does not contend that the Superior Court committed error and does not seek relief from its judgment," "Mr. Coleman seeks damages and declaratory relief due to the District's unconstitutional statute and taking." Opp. at 37. Thus, Mr. Coleman challenges the District's statutory scheme insofar as it provides for the taking, not of a foreclosed property, but of the entirety of the equity in that property, without recourse for a taxpayer to recover the amount of that equity less any taxes, penalties, costs, and interest owed.

The District relies heavily on a 1993 decision of the Seventh Circuit, which held that *Rooker-Feldman* barred federal-court jurisdiction over a takings claim that a local government had unconstitutionally retained the entire proceeds of a tax sale. *See Ritter v. Ross*, 992 F.2d 750, 751–52, 754–55 (7th Cir. 1993). In that case, the plaintiffs "admit[ted] that but for the tax lien foreclosure judgment . . . they would have no complaint: they would still have their land and would have suffered no injury." *Id.* at 754. "The state court proceedings, as the Plaintiffs themselves state, 'are the subject of this case.'" *Id.* The Seventh Circuit thus concluded that "their claims . . . are *inextricably intertwined* with the merits of that proceeding." *Id.* at 755 (emphasis added). As Mr. Coleman noted at oral argument, *Ritter* relied on the "inextricably

intertwined" language, which was narrowed significantly in 2005 by the Supreme Court's *Exxon* decision.

More instructive is the Ninth Circuit's recent decision in *Bell v. City of Boise*, 709 F.3d 890 (9th Cir. 2013), which permitted plaintiffs who had been convicted of violating an ordinance outlawing "camping" in public places to bring a federal constitutional claim for retrospective damages regarding the alleged unconstitutionality of that ordinance. *See* 709 F.3d at 896-97. Although the plaintiffs sought remedies for the allegedly unconstitutional enforcement of the ordinance against them in the form of expungement of their state-court convictions and damages related to "criminal fines" and "costs of incarceration" arising out of those convictions, the Ninth Circuit emphasized that "even if a plaintiff seeks relief from a state court judgment, such a suit is a forbidden de facto appeal only if the plaintiff *also* alleges a legal error by the state court." *Id.* at 894, 897. "Although Plaintiffs sought relief designed to remedy injuries suffered from a state court judgment, they did not allege before the court that the state court committed legal error, nor did they seek relief from the state court judgment itself"; instead, they "assert as a legal wrong an allegedly illegal act by an adverse party—the City's allegedly unconstitutional enforcement of the Ordinances." 709 F.3d at 898 (quotation marks and alteration omitted).

Mr. Coleman's claim for compensation for the taking of his surplus equity in the property survives *Rooker-Feldman* because he does not challenge the Foreclosure Judgment, but the District's allegedly unconstitutional enforcement of the statute providing for a taking of his surplus equity. In the language of *Bell*, Mr. Coleman's claim is not "a direct challenge to a state court's factual or legal conclusion." *Id.* at 897. Indeed, Mr. Coleman alleges no legal error by the Superior Court. As discussed previously, he accepts the Foreclosure Judgment, the loss of his real property, and the satisfaction of his "tax" debts. *See supra* Part III.A.1. Just as the *Bell* plaintiffs sought damages that grew out of their state-court prosecution, Mr. Coleman seeks damages that, while related in some sense to the Foreclosure Judgment, are distinct from it.[6]

   4.   *Res Judicata*

---

[6] The Court is not persuaded by the District's reliance on the Tenth Circuit's decision in *Campbell*. In that case, a plaintiff was barred by *Rooker-Feldman* from bringing a Takings Clause claim to recover just compensation for the value of horses that had been the subject of a state-court forfeiture proceeding. *See* 682 F.3d at 1279. The Tenth Circuit held that *Rooker-Feldman* barred that claim because "the deprivation of property that was allegedly without just compensation . . . was the deprivation ordered by the state court." *Id.* at 1284. The forfeiture was an "act[] of the state court." *Id.* at 1285. Here, by contrast, Mr. Coleman does not challenge the deprivation ordered by the Superior Court, he challenges the District's independent statutory taking of his surplus equity without avenue for recovery.

The District's final jurisdictional argument is that Mr. Coleman's claims are barred by the doctrine of *res judicata* because they "could have been raised in an earlier action but were not." Mot. at 16. To determine whether *res judicata* applies, the Court must look to the Full Faith and Credit Act, which provides that judgments of the courts of any state, territory, or possession "shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken." 28 U.S.C. § 1738. This means that a state-court judgment receives "'the same respect that it would receive in the courts of the rendering State.'" *Herrion v. Children's Hosp. Nat'l Med. Ctr.*, 448 F. App'x 71, 72 (D.C. Cir. 2011) (quoting *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 373 (1996)). The parties agree that, under D.C. law, the Court must determine whether *res judicata* applies by looking to: "(1) whether the claim was adjudicated finally in the first action; (2) whether the present claim is the same as the claim which was raised or which might have been raised in the prior proceeding; and (3) whether the party against whom the plea is asserted was a party or in privity with a party in the prior case." *Calomiris v. Calomiris*, 3 A.3d 1186, 1190 (D.C. 2010) (quotation marks

omitted). It is undisputed that Mr. Coleman's claims were not actually litigated in a prior proceeding.

The District argues that Mr. Coleman's claims are nonetheless barred by *res judicata* because the Superior Court "rendered a final judgment on the merits relating to the tax sale purchaser's Motion for Entry of Default Judgment" and Mr. Coleman could have raised his Takings Clause claims in that action. *See* Mot. at 17–19. Mr. Coleman responds that he could not have asserted his claims against the plaintiff in the Superior Court case, the purchaser of the tax lien, and the District was a co-defendant, against whom he had no obligation to raise a cross-claim. *See* Opp. at 31–32.

In Superior Court, cross-claims are permissive:

> A pleading may state as a cross-claim any claim by 1 party against a co-party arising out of the transaction or occurrence that is the subject matter either of the original action or of a counterclaim therein or relating to any property that is the subject matter of the original action. Such cross-claim may include a claim that the party against whom it is asserted is or may be liable to the cross-claimant for all or part of a claim asserted in the action against the cross-claimant.

Super. Ct. R. Civ. P. 13(g). The effect of the nearly identical federal rule is that "a party in a civil action is not precluded from litigating a claim simply because it had an opportunity to raise the claim as a cross-claim in a prior suit to which it was a party." *Corestates Bank, N.A. v. Huls Am., Inc.*, 176 F.3d 187,

199 (3d Cir. 1999); *see also RX Data Corp. v. Dep't of Soc.
Servs.*, 684 F.2d 192, 196 (2d Cir. 1982); *Hall v. Gen. Motors
Corp.*, 647 F.2d 175, 184 (D.C. Cir. 1980) (R.B. Ginsburg, J.)
(noting "the general rule that cross-claims are permissive, not
compulsory"). The District conceded at oral argument that *res
judicata* generally would not bar a party from raising in a
subsequent action a claim that would have been a cross-claim in
a prior action.

   The District responds that although it and Mr. Coleman were
co-defendants, their interests were so adverse that Mr. Coleman
should have raised his Takings Clause claims against the
District in that proceeding. In support of this argument, the
District cites a handful of clearly distinct cases. Most
prominently, the District cited *Kolb v. Scherer Brothers
Financial Services Co.*, 6 F.3d 542 (8th Cir. 1993), which
treated co-defendants—all of whom held mechanic's liens on a
property—as adverse in an action brought by another lienholder.
The Eighth Circuit noted that "it would be pure fiction to
conclude that no adversity in fact exists between the parties
merely because they are all designated as defendants." *Id.* at
545. Under Minnesota law, each defendant "makes the action his
or hers, for the purpose of enforcing his or her lien" and "any
lienholder entitled to relief may pursue the foreclosure to its
conclusion regardless of whether or not the nominal plaintiff

presents a viable lien claim." *Id.* (alterations omitted). The Eighth Circuit went on to note that "[a]ny party who files an answer in a mechanic's lien action, though nominally a defendant, may actually function as a plaintiff with regard to other named defendants." *Id.* The District also cited *Eyde v. Charter Township of Meridian*, 324 N.W.2d 775, 779 (Mich. Ct. App. 1982), in which a plaintiff who had been a losing co-defendant with a town in an action by town residents seeking to force a referendum on the town's re-zoning of the plaintiff's property was barred by *res judicata* in a subsequent suit against the town seeking to obtain the re-zoning and enjoin the referendum because the subsequent suit raised arguments "to defeat the action for a referendum" that could have been raised in the prior case and "[f]or purposes of [that] defense, the Township and its residents were the same party."[7]

Mr. Coleman and the District were not adverse in the sense described in *Kolb* or *Eyde*. Though the District's sale of a tax lien on Mr. Coleman's property rendered it adverse to Mr. Coleman in a colloquial sense, the District's presence as a

---

[7] The other cases cited by the District recited the general rule that co-parties may be considered adverse in certain situations, but either held that it did not apply, *Exec. Arts*, 391 F.3d at 795 (*res judicata* did not apply because "the City and Executive Arts did not have any controversy between themselves when the first decision was rendered"), or described factually distinct scenarios. *See, e.g.*, *Lesher v. Lavrich*, 784 F.2d 193, 194–95 (6th Cir. 1986) (claim itself had been actually litigated in a prior proceeding).

defendant in the Superior Court case was largely pro forma. The proceeding sought to determine whether Embassy could foreclose Mr. Coleman's right of redemption, and the District had no property right to enforce against Mr. Coleman. This was far from the *Kolb* parties, who all had competing property interests and, pursuant to state law, could "function as a plaintiff with regard to the other named defendants." 6 F.3d at 545. Nor were the District and Embassy "the same party" for the purposes of any defense that Mr. Coleman may have raised in the Superior Court action. *See Eyde*, 324 N.W.2d at 795. Just because Mr. Coleman and the District did not have identical interests does not make them sufficiently adverse to trigger a compulsory counterclaim. Accordingly, Mr. Coleman was not required to raise his Takings Clause claims against the District and is not barred by *res judicata* from doing so now.

**B.    Mr. Coleman Has Stated a Claim for a Violation of the Takings Clause.**

In addition to its jurisdictional arguments, the District argues that Mr. Coleman fails to state a claim for a violation of the Takings Clause. Plaintiff's theory is that the District has effected an unconstitutional taking by precluding him entirely from obtaining the surplus equity in his home that remains after subtracting the taxes, penalties, costs, and interest he owed. Mr. Coleman's argument implicates a series of

Supreme Court decisions applying the Takings Clause to tax sales.

The story begins in 1881. That year, the Supreme Court had occasion to interpret a federal statute that permitted the federal government to engage in tax sales to recover delinquent tax debts. *See United States v. Taylor*, 104 U.S. 216, 218 (1881). The Court interpreted the statute to mean that the former owner "would be entitled to the surplus money" after the tax sale. *See id.* This statutory interpretation became relevant three years later in *United States v. Lawton*, 110 U.S. 146 (1884). In that case, an heir to an individual whose property was sold under the same statute sought "surplus proceeds of the sale" and was denied. *Id.* at 149. In light of the fact that the statute required that the surplus be provided to that individual, the Supreme Court stated that "[t]o withhold the surplus from the owner would be to violate the fifth amendment to the constitution, and deprive him of his property without due process of law or take his property for public use without just compensation." *Id.* at 150.

In 1956, the Supreme Court revisited the issue in *Nelson v. City of New York*, 352 U.S. 103 (1956). In that case, the City of New York had utilized a tax-sale procedure. *See id.* at 105–06. The City retained one of the properties at issue and retained the proceeds of the sale of the other property, which "far

exceed[ed] in value the amounts due." *Id.* at 109. The plaintiffs alleged that this constituted a violation of the Due Process Clause and the Takings Clause. *See id.* As to the takings issue, the Supreme Court examined *Lawton*, but noted that "the statute involved in that case had been construed . . . to require that the surplus be paid to the owner." *Id.* at 110. The *Nelson* Court stated:

> But we do not have here a statute which absolutely precludes an owner from obtaining the surplus proceeds of a judicial sale. In *City of New York v. Chapman Docks Co.*, an owner filed a timely answer in a foreclosure proceeding, asserting his property had a value substantially exceeding the tax due. The Appellate Division construed [the tax-sale statute] to mean that upon proof [that the sale value substantially exceeded the amount of taxes due] a separate sale should be directed so that the owner might receive the surplus.

*Id.* (citation omitted). The statute had therefore previously been interpreted to provide an avenue for the recovery of surplus equity. The Supreme Court went on:

> What the City of New York has done is to foreclose real property for charges four years delinquent and, in the absence of timely action to redeem *or to recover[] any surplus*, retain the property or the entire proceeds of its sale. We hold that nothing in the Federal Constitution prevents this where the record shows adequate steps were taken to notify the owners of the charges due and the foreclosure proceedings.

*Id.* (emphasis added).

Mr. Coleman seizes on the first quote—"we do not have here a statute which absolutely precludes an owner from obtaining the

surplus"—to argue that *Nelson* does not foreclose his claim. The District focuses on the second—upholding the retention of "the entire proceeds of its sale" due to "the absence of timely action to redeem or to recover[] any surplus." *Id.* Mr. Coleman's view of *Nelson* is correct. The Supreme Court clearly held open the question presented by Mr. Coleman when it noted "[b]ut we do not have here a statute which absolutely precludes an owner from obtaining the surplus proceeds of a judicial sale." *Id.* The subsequent language cited by the District does not foreclose Mr. Coleman's claim because D.C. provides no action to recover any surplus.[8] Mr. Coleman's claims, therefore, are not foreclosed by *Nelson*.

The story resumes in 1969. In *Balthazar v. Mari Limited*, 301 F. Supp. 103 (N.D. Ill. 1969), a three-judge panel of the U.S. District Court for the Northern District of Illinois was presented with a case in which the plaintiffs alleged a violation of the Due Process and Takings Clauses when their property was sold in a tax sale, pursuant to a statute which held that "when an owner fails to redeem [his property] . . . the purchaser [of the tax lien] may obtain the property for a

---

[8] At oral argument, the District argued that *Nelson* overruled *Lawton*. As the District conceded, nothing in the language of *Nelson* indicates that *Lawton* was being overruled. In fact, the Court in *Nelson* explained that its decision was consistent with *Lawton*, noting that "the statute involved in that case had been construed . . . to require that the surplus be paid to the owner." *Id.* at 110.

fraction of its market value, thus gaining as a windfall all surplus value which exceeds the land's tax and interest liabilities. *Id.* at 104–05. The only mention of the Takings Clause in the district court's decision was in a footnote, which did not mention *Nelson* and stated: "Relying upon Supreme Court condemnation cases, plaintiffs also maintain that they were deprived of 'just compensation' for their property. These cases are inapplicable. Rather than taking private property for a public purpose, Illinois is here collecting taxes which are admittedly overdue." *Id.* at 105 n.6.

The Supreme Court summarily affirmed the judgment of the district court without elaboration. *See Balthazar v. Mari Ltd.*, 396 U.S. 114 (1969). The Court's Opinion stated only: "The motions to affirm are granted and the judgment is affirmed. Mr. Justice Douglas is of the opinion that probable jurisdiction should be noted." *Id.* at 114. The District argues that this forecloses Mr. Coleman's claims because, it believes, the claim presented in *Balthazar* was identical to Mr. Coleman's. This argument is tenuous from the outset because "[a]n unexplicated summary affirmance settles the issue for the parties, and is not to be read as a renunciation by this Court of doctrines previously announced in our opinions after full argument." *Mandel v. Bradley*, 432 U.S. 173, 176 (1977) (quotation marks omitted). A summary affirmance operates to "reject the specific

challenges presented in the statement of jurisdiction,"
"prevent[s] lower courts from coming to opposite conclusions on
the precise issues presented and necessarily decided by those
actions," and "should not be understood as breaking new ground
but as applying principles established by prior decisions to the
particular facts involved." *Id.* Accordingly, "[a] summary
disposition affirms only the judgment of the court below, and no
more may be read . . . than was essential to sustain that
judgment." *Anderson v. Celebrezze,* 460 U.S. 780, 785, n.5
(1983).

The jurisdictional statement filed with the Supreme Court by
the plaintiffs in *Balthazar* claimed that "[t]he court below[]
relied solely on a misapprehension of this Court's opinion in
*Nelson v. New York*. In that case[,] this Court upheld a
statutory tax deed system because it met the requirements of due
process as it provided a means for excess value over the
delinquency to go to the benefit of the property owner."
Jurisdictional Statement, *Balthazar v. Mari Ltd.*, No. 593, 1969
WL 136737, at *2 (U.S. Sept. 15, 1969). The plaintiffs asserted
that they presented the question "[w]hether the Illinois 'tax
deed' statute is invalid as allowing confiscation of property
without an opportunity for just compensation," especially in
light of the fact that "[t]here is no way under the Illinois

42

statute for an owner who is unable to redeem to obtain his equity above his tax debt." *Id.* at *2, 4.

The District argues that this is evidence that the Supreme Court viewed the *Balthazar* statute as no different from the *Nelson* statute, but that is entirely at odds with *Nelson* itself, which expressly reserved the question whether a tax sale law with no avenue for recovery of the surplus would be constitutional. As Mr. Coleman notes, it would be odd to "assume that the Court silently determined the question that it specifically reserved in *Nelson*." Opp. at 24. Moreover, *Balthazar* differs from Mr. Coleman's case in a number of ways that make its summary affirmance unhelpful. First, the remedies sought in each case differ significantly. Mr. Coleman seeks just compensation and a corresponding declaratory judgment. The plaintiffs in *Balthazar* did not sue a defendant that could have paid just compensation, *Balthazar*, 301 F. Supp. at 103, and they appear to have sought an injunction because their case was brought pursuant to a jurisdictional statute providing for a three-judge panel to hear applications for injunctions "'restraining the enforcement, operation or execution of any state statute.'" Opp. at 24–25 n.2 (quoting 28 U.S.C. § 2281) (repealed 1976).

Given the narrow interpretation accorded summary affirmances— which Justices have recently described as "a rather slender reed

on which to rest future decisions," *Morse v. Republican Party of Va.*, 517 U.S. 186, 203 n.21 (1996) (quotation marks omitted), and as "carr[ying] little more weight than denials of certiorari," *Hohn v. United States*, 524 U.S. 236, 260 (1998) (Scalia, J., dissenting)—these factual distinctions and the Supreme Court's express reservation of the relevant question in *Nelson* counsel in favor of reading the summary affirmance in *Balthazar* narrowly, to hold that the injunctive relief sought against defendants who could not pay just compensation was not warranted. This holding, even if undisturbed by subsequent doctrinal developments, does not foreclose Mr. Coleman's claim.

Only a handful of post-*Balthazar* decisions have addressed a federal Takings Clause claim regarding the taking of equity without avenue for its recovery.[9] Three decisions have denied such claims on the grounds that *Nelson* foreclosed such a claim. *See Reinmiller v. Marion Cnty.*, No. CV-05-1926, 2006 WL 2987707, at *3 (D. Or. Oct. 16, 2006); *City of Auburn v. Mandarelli*, 320 A.2d 22, 32 (Me. 1974); *Ritter v. Ross*, 558 N.W. 2d 909, 912

---

[9] The District cited a recent decision of the Second Circuit, but that decision did not address a Takings Clause claim at all; it analyzed the due-process elements of *Nelson* and rejected a claim that the retention of the surplus from a tax sale infringed on "rights to due process and equal protection." *Miner v. Clinton Cnty.*, 541 F.3d 464, 475 (2d Cir. 2008).

(Wis. Ct. App. 1996).[10] All three, however, recognized that such a claim could be stated where a state statute or constitutional provision granted an interest in the surplus equity. *See Reinmiller*, 2006 WL 2987707, at *3; *City of Auburn*, 320 A.2d at 32; *Ritter*, 558 N.W. 2d at 912–13.[11]

This Court draws two clear principles from the Supreme Court's decisions in *Lawton* and *Nelson*. *Nelson* makes clear that a Takings Clause violation regarding the retention of equity will not arise when a tax-sale statute provides an avenue for recovery of the surplus equity. 352 U.S. at 109. *Lawton* makes clear that a Takings Clause violation will arise when a tax-sale statute grants a former owner an independent property interest

---

[10] Courts have rejected Takings Clause challenges to tax sales themselves, but these decisions do not shed light on the meaning of *Nelson* because the courts were not presented with claims regarding surplus equity. *See, e.g.*, *Speed v. Mills*, 919 F. Supp. 2d 122, 129 (D.D.C. 2013); *Indus. Bank of Wash. v. Sheve*, 307 F. Supp. 98, 99 (D.D.C. 1969).

[11] In addition, two Justices of the Supreme Court of New Hampshire indicated their belief that the federal Takings Clause and its New Hampshire counterpart require the ability to recover surplus equity. *See First N.H. Bank v. Town of Windham*, 639 A.2d 1089, 1097–98 (N.H. 1994) (Horton, J., concurring) ("May the taxing power include an arbitrary forfeiture, a movement of property to the State without just compensation? I think not, and instead would subscribe to an interpretation of the tax lien enforcement provisions that would satisfy these constitutional objections by limiting recovery to the obligation secured by the lien."). This position was ultimately adopted as an interpretation of the New Hampshire Constitution. *See Thomas Tool Servs., Inc. v. Town of Croydon*, 761 A.2d 439, 441 (N.H. 2000). Vermont interprets its constitution similarly. *See Bogie v. Town of Barnet*, 270 A.2d 898, 900–01 (Vt. 1970).

in the surplus equity and the government fails to return that surplus. 110 U.S. at 149. The question Mr. Coleman's case presents is: What if the tax-sale statute does not provide a right to the surplus and the statute provides no avenue for recovery of any surplus? A property interest in equity could conceivably be created by some other legal source. In that circumstance, failure to provide an avenue for recovery of the equity would appear to produce a result identical to *Lawton*: Property to which an individual is legally entitled has been taken without recourse.[12] The issue, then, is whether Mr. Coleman has a property interest in his equity and, if so, whether an unconstitutional taking of that property has been alleged.

The Fifth Amendment to the United States Constitution provides, in relevant part, "nor shall private property be taken for public use, without just compensation." Inherent in the Amendment, then, is that "property" must be at issue. "Because the Constitution protects rather than creates property interests, the existence of a property interest is determined by

---

[12] One of the decisions to interpret *Nelson* grasped this point in part when it held that where the government "retain[s] the entire amount of the sale proceeds," the Takings Clause comes into play "only if the state constitution or tax statutes create [a property interest in the surplus]." *Ritter*, 558 N.W. 2d at 910, 912. The Wisconsin Court of Appeals "consider[ed] whether the [plaintiffs] had a property interest in the excess proceeds of the foreclosure sale" and, upon concluding that they did not under Wisconsin law, denied their Takings Clause claim. *Id.* at 912–13.

reference to 'existing rules or understandings that stem from an independent source such as state law.'" *Phillips v. Wash. Legal Found.*, 524 U.S. 156, 164 (1998) (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)). *Lawton* indicated that such an interest may be created by a statute that requires the refunding of surplus equity after a tax sale. *See Lawton*, 110 U.S. at 149. Mr. Coleman contended that he has a protected property interest in the equity in his home based on principles of D.C. law and decisions of the D.C. Court of Appeals. *See* Opp. at 18 (citing *Lewis v. Lewis*, 708 A.2d 249 (D.C. 1998); *Gore v. Gore*, 638 A.2d 672 (D.C. 1994)). Mr. Coleman similarly argued that he establishes the remaining elements of a Takings Clause claim: that his property was "taken"; that he was provided no "just compensation"; and that the taking was not for a "public purpose." *See id.* at 18-22.

The Court need not—and indeed cannot—address the viability of these arguments because the District failed to respond to them. Neither its motion nor its reply brief challenged whether Mr. Coleman satisfied the elements of a Takings Clause claim. Instead, the District declared that "[t]he District's substantive defense is based on the Supreme Court's treatment of tax sale foreclosure statutes in decisions that [the District claims] are directly on point. There is no reason to defend a tax sale foreclosure statute as a Fifth Amendment taking because

47

no court has found that to be the appropriate analysis." Reply at 15. "Because the District failed to address these [issues] in its motion 'and fail[ed] to respond to Plaintiff's point[s] in its Reply, the Court will deem [them] abandoned at least for now.'" *McGinnis v. District of Columbia*, No. 13-1254, 2014 WL 4243542, at *15 (D.D.C. Aug. 28, 2014) (quoting *Ashraf-Hassan v. Embassy of France*, 878 F. Supp. 2d 164, 173-74 (D.D.C. 2012)); *see also Lewis v. United States*, No. 90-991, 1990 WL 179930, at *2 (D.D.C. Oct. 29, 1990); *cf. Herbert v. Nat'l Acad. of Sciences*, 974 F.2d 192, 196 (D.C. Cir. 1992) (noting the court's "dependence as an Article III court on the adversarial process for sharpening the issues for decision" as a reason to decline to consider arguments newly raised in a reply brief). Accordingly, the Court must assume that Mr. Coleman established the existence of an independent property interest in the equity in his home, as well as the remaining elements of a Fifth Amendment Takings Clause claim.

## IV.  Conclusion

For the foregoing reasons, the District's motion to dismiss is **DENIED**. An appropriate Order accompanies this Memorandum Opinion.

**Signed:**    **Emmet G. Sullivan**
         **United States District Judge**
         **September 30, 2014**