**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

—————————————————————————

                                                )
BENJAMIN COLEMAN, through his   )
Conservator, ROBERT BUNN, et al.,  )
                                                )
              Plaintiffs,         )
                                                ) Civ. Action No. 13-1456 (EGS)
        v.                        )
                                                )
DISTRICT OF COLUMBIA,             )
                                                )
              Defendant.          )
—————————————————————————)

<u>**MEMORANDUM OPINION**</u>

Benjamin Coleman brought this lawsuit to challenge a District of Columbia law that directed the sale of a lien on his home after he failed to pay a $133.88 property-tax bill. That law permitted the private purchaser of the lien to add $4,999 in interest, costs, and fees to Mr. Coleman's bill and, when Mr. Coleman could not pay, to institute a foreclosure proceeding. After the foreclosure proceeding, the private purchaser obtained title to Mr. Coleman's home. Mr. Coleman, however, received nothing, although the amount of equity he had in his home far surpassed the amount he admittedly owed in taxes, interest, costs, and related fees. Because the loss of this surplus equity was dictated by District of Columbia law, Mr. Coleman sued to challenge that law. His claim is that the taking of his excess equity—the amount of equity minus the taxes and related costs he admits that he owed—violated his constitutional rights under the

Takings Clause of the Fifth Amendment to the United States
Constitution. As a remedy for the alleged constitutional
violation, Mr. Coleman asked this Court to award him monetary
damages and to issue a declaratory judgment. Mr. Coleman brought
this case not only on his own behalf, but also as a
representative of all District property owners who suffered a
loss of excess equity due to the District's tax-sale law.

In September of 2014, this Court rejected the District's
attempt to dismiss the case. *See Coleman ex rel. Bunn v.
District of Columbia*, No. 13-1456, 2014 WL 4819092 (D.D.C. Sept.
30, 2014). Subsequently, the Court permitted Mr. Coleman to
amend his Complaint to add a second named plaintiff, the Estate
of Jean Robinson. Ms. Robinson, like Mr. Coleman, lost her
excess equity due to the District's tax-sale law. Her son,
Wellington Robinson, as personal representative of her estate,
seeks the same relief as Mr. Coleman.

Mr. Coleman and Ms. Robinson's Estate now ask the Court to
certify this lawsuit as a class action, to permit them to
represent all other District of Columbia property owners who
similarly lost equity in excess of the amount of taxes and
related fees they owed because of the tax-sale law. Upon
consideration of their motion, the response and reply thereto,
the applicable law, the entire record, and the oral argument,
the Court concludes that Mr. Coleman and Ms. Robinson's Estate

are entitled to certification as a class action and **GRANTS** their
motion.

## I.   Background

### A.   The Challenged Tax-Sale Statutes

"The District of Columbia's laws governing the procedure for
collecting delinquent property taxes are codified in Chapter 13A
of title 47 of the D.C. Code." *Coleman*, 2014 WL 4819092, at
*2. When a property-tax payment becomes delinquent, that tax
obligation "automatically become[s] a lien on the real
property." D.C. Code § 47–1331(a). The District is then required
to "sell all real property on which the tax is in
arrears." *Id.* § 47–1332(a). These sales follow a defined
procedure:

> "At least 30 days before" any such sale is to be
> advertised, "the Mayor shall mail to the person who last
> appears as owner of the real property on the tax roll .
> . . a notice of delinquency." *Id.* § 47–1341(a). Once
> thirty days have passed "from the mailing of the notice
> of delinquency," the District must advertise that the
> property "will be sold at public auction because of
> taxes." *Id.* § 47–1342(a). At this public sale, the
> District must sell the property "in its entirety," *id.* §
> 47–1343, "to the purchaser who makes the highest
> bid." *Id.* § 47–1346(a)(2). Sales are not to be conducted
> "for less than the amount of the taxes," however. *Id.* §
> 47–1346(c).

*Coleman*, 2014 WL 4819092, at *2.

During the six months following the sale, "the purchaser may
not foreclose the original owner's right to redeem the
property." *Id.* (citing D.C. Code § 47–1370(a)). The original

owner is able to redeem the property "by paying to the District 'the amount paid by the purchaser . . . exclusive of surplus with interest thereon,' as well as 'other taxes, interest, and penalties paid by a purchaser,' and 'expenses for which the purchaser is entitled to reimbursement.'" *Id.* (citing D.C. Code § 47–1361(a)).

After the redemption period closes, the purchaser "may file a complaint to foreclose the right of redemption of the real property." D.C. Code § 47–1370(a). "The purchaser of the tax-sale certificate must bring the action against the original owner of the property and the District of Columbia, as well as any entity with a particular interest in the property." *Coleman*, 2014 WL 4819092, at *2 (citing D.C. Code § 47–1371(b)(1)). The Court has described the potential effects of such a legal action:

> The law permits the Superior Court to issue a final judgment "foreclosing the right of redemption," which bars the original owner from redeeming the property and vests in the purchaser a deed in fee simple. *See id.* § 47–1382(a). In doing so, the law permits the taking of not only the amount of delinquent taxes, plus any costs, fees, and interest, but also the entirety of the original owner's equity in the property.

*Id.*

## B.   The District's Amended Tax-Sale Statute

After this lawsuit was filed in 2013, the D.C. Council passed two temporary amendments to the District's tax-sale law. On

4

October 4, 2013, the Council passed an emergency amendment, which served, among other things, "to cancel any tax sale that occurred for the July 2013 tax sale of a resident's real property who is a senior citizen, veteran, or disabled individual" and "to require the District to pay the owner of record before the tax sale any amount . . . in excess of the amount of taxes due to the District." District Real Property Tax Sale Emergency Act, A20-179, pmbl.; *see also id.* § 2. On October 17, 2013, the District passed a temporary amendment, which codified the October 4th emergency amendment. *See* District Real Property Tax Sale Temporary Act of 2013, A20-194, § 2.

In 2014, the D.C. Council enacted another temporary emergency measure, which expired on August 26, 2014. *See* Residential Real Property Equity and Transparency Emergency Amendment Act of 2014, A20-342. That amendment modified the procedures for future tax sales to, among other things, provide for the return of a portion of the excess equity to the former homeowner after the sale occurs. *See id.* § 101(c)(31). A permanent amendment to the District's tax-sale law, with similar effect, has now been passed. *See* D.C. Fiscal Year 2015 Budget Support Act of 2014, A20-424, § 7102(c)(30). That amendment appears to have taken effect on February 26, 2015. *See* B20-0750 – Fiscal Year 2015 Budget Support Act of 2014, D.C. Council, http://lims.dccouncil. us/Legislation/B20-0750 (last visited April 13, 2015).

**C.    Procedural History**

This lawsuit was filed on behalf of Mr. Coleman by Robert
Bunn, who was appointed by the Superior Court "to manage
Mr. Coleman's legal and financial affairs." Compl., ECF No. 1 ¶
15. The District moved to dismiss this case, arguing that the
Court lacked jurisdiction over Mr. Coleman's claims and that he
failed to state a claim for a violation of the Takings Clause.
*See* Def.'s Mot. to Dismiss, ECF No. 5. While that motion was
pending, Mr. Coleman moved for class certification. *See* First
Mot. to Certify Class, ECF No. 12.

The Court held a hearing on the District's motion to dismiss
on September 26, 2014, and issued its Opinion denying the motion
on September 30, 2014. *See Coleman*, 2014 WL 4819092. The Court's
Order denying the motion to dismiss directed the parties to
"file supplemental briefs addressing the effect, if any, of the
accompanying Memorandum Opinion on plaintiff's pending motion
for class certification." Order, ECF No. 17 at 1. While the
parties were briefing this issue, Mr. Coleman moved for leave to
submit an amended complaint, to add as a named plaintiff the
Estate of Jean Robinson. *See* Mot. to Amend, ECF No. 20. The
District opposed the motion on the grounds that amendment would
be futile because Ms. Robinson's will had not been admitted to
probate, and her son, Wellington Robinson, had not been
appointed as representative of her estate. *See* Opp. to Mot. to

Amend, ECF No. 22. At Mr. Coleman's request, the Court deferred
ruling on this motion while probate proceedings were underway.

On December 29, 2014, Mr. Coleman informed the Court that Ms.
Robinson's will had been admitted to probate and that Wellington
Robinson had been appointed personal representative of the
estate. *See* Pl.'s Status Report, ECF No. 29. The Court granted
the motion to amend the following day. *See* Minute Order of
December 30, 2014. In light of the addition of a new potential
class representative, the Court denied without prejudice Mr.
Coleman's motion for class certification and directed the filing
of a renewed motion to address "whatever effect, if any, the new
plaintiff may have on the class-certification analysis." *Id.*

The plaintiffs filed their motion for class certification on
January 9, 2015. *See* Pls.' Mem. in Supp. of Mot. to Certify
Class ("Mem."), ECF No. 31-1. In that motion, they seek to
certify two classes. *See id.* at 4. The first, "the damages
class," is defined as:

> All persons who owned residential property on which the
> District of Columbia assessed a lien for an unpaid
> property tax deficiency, and where following the sale of
> a tax deed, such property was foreclosed upon and title
> transferred pursuant to D.C. Code §§ 47-1330 to 47-1385
> and where such property included equity above the amount
> of real estate taxes, interest, penalties, expenses and
> attorney's fees at the time a tax deed was issued.

*Id.* The second class, "the declaratory relief class," is defined
slightly differently:

>All persons who own or owned residential property on
>which the District of Columbia has assessed a lien for
>an unpaid property tax deficiency, and for which lien
>the District subsequently sold the right to foreclose
>the right of redemption for the property pursuant to
>D.C. Code §§ 47-1330 to 47-1385 and where such property
>included equity above the amount of real estate taxes,
>interest, penalties, expenses and attorney's fees at the
>time a tax deed was issued.

*Id.* The District opposes the motion for class certification,
Def.'s Opp. to Mot. to Certify Class ("Opp."), ECF No. 33, and
the plaintiffs have filed a reply brief. *See* Pls.' Reply in
Supp. of Mot. to Certify Class ("Reply"), ECF No. 34. At the
Court's request, the parties filed supplemental briefs on March
18, 2015 answering a question not addressed in either parties'
pleadings. *See* Pls.' Suppl. Br., ECF No. 35; Def.'s Suppl. Br.,
ECF No. 36; Part III.B.1, *infra*. The Court held oral argument on
the motion on March 25, 2015, and the motion is now ripe for
resolution.

## II.  Standing

"Any analysis of class certification must begin with the issue
of standing." *Prado-Steinman ex rel. Prado v. Bush*, 221 F.3d
1266, 1280 (11th Cir. 2000) (quotation marks and alteration
omitted); *see also In re Lorazepam & Clorazepate Antitrust
Litig.*, 289 F.3d 98, 108 (D.C. Cir. 2002) ("The question of
constitutional standing . . . is a prerequisite to Rule 23 class
certification because it goes to the court's jurisdiction.").
"To satisfy Article III's standing requirement, 'a plaintiff

ordinarily must establish that (1) he or she has suffered an injury-in-fact; (2) there is a causal connection between the injury and the conduct complained of; and (3) the injury will likely be redressed by a favorable decision.'" *Assoc. Builders & Contractors, Inc. v. Shiu*, 30 F. Supp. 3d 25, 34 (D.D.C. 2014) (quoting *In re Polar Bear Endangered Species Act Listing*, 627 F. Supp. 2d 16, 24 (D.D.C. 2009)).

Plaintiffs also "bear[] the burden of showing that [they have] standing for each type of relief sought." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). When a party seeks a declaratory judgment, this requires that the case be one "of actual controversy within [the Court's] jurisdiction." 28 U.S.C. § 2201(a). "'To establish that a matter is a controversy rather than an abstract question, a party seeking declaratory relief must show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Covington v. JPMorgan Chase*, No. 9-30, 2014 WL 3734265, at *7 (D.D.C. July 30, 2014) (quoting *Hoffman v. District of Columbia*, 643 F. Supp. 2d 132, 140 (D.D.C. 2009)).

Plaintiffs have asserted, and the District does not dispute, that the Damages Class has standing. *See* Mem. at 5.[1] The District

---

[1] Individuals whose property was foreclosed upon and title transferred pursuant to the District's tax-sale statute have

argued in its opposition brief that the Declaratory Relief Class lacks standing because it contains members whose claims would be rendered moot by the enactment of amendments to the District's tax-sale law. *See* Opp. at 25-27. Those amendments went into effect soon after the parties finished briefing the motion for class certification. During the March 25, 2015 hearing, the plaintiffs conceded that the Court should consider defining the Declaratory Relief Class in a manner that would render it identical to the Damages Class. The District agreed that this would absolve any standing issue. Accordingly, the Court will consider whether to certify the Declaratory Relief Class, defined as:

> All persons who owned residential property on which the District of Columbia assessed a lien for an unpaid property tax deficiency, and where following the sale of a tax deed, such property was foreclosed upon and title transferred pursuant to D.C. Code §§ 47-1330 to 47-1385 and where such property included equity above the amount of real estate taxes, interest, penalties, expenses and attorney's fees at the time a tax deed was issued.

Mem. at 4. This class may seek a retrospective declaratory judgment because its claims are "intertwined with a claim for monetary damages that requires [the Court] to declare whether a

---

suffered an injury insofar as they had equity above the amount of taxes, interest, and related costs and penalties owed. *See Coleman*, 2014 WL 4819092, at *17 (if a separate property interest in equity exists, the effect of the law would appear to be that "[p]roperty to which an individual is legally entitled has been taken without recourse").

past constitutional violation occurred." *Lippoldt v. Cole*, 468 F.3d 1204, 1217 (10th Cir. 2006) (quotation marks omitted).

## III. Class Certification

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013) (quotation marks omitted). Certification of a class action is governed by Rule 23 of the Federal Rules of Civil Procedure, and a plaintiff "must affirmatively demonstrate his compliance with" Rule 23. *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011). "This is done not by pleading compliance, but by 'demonstrating compliance in fact.'" *Artis v. Yellen*, No. 1-400, 2014 WL 4801783, at *8 (D.D.C. Sept. 29, 2014) (quoting *Wal-Mart*, 131 S. Ct. at 2551) (alterations omitted). The process of assessing a plaintiff's compliance with Rule 23 is often "enmeshed in the factual and legal issues comprising the plaintiff's cause of action" so the Court may inquire into the merits of the plaintiffs' claims, *Wal-Mart*, 131 S. Ct. at 2551–52, but only to the extent necessary "'to determin[e] whether the Rule 23 prerequisites for class certification are satisfied.'" *D.L. v. District of Columbia*, 713 F.3d 120, 126 (D.C. Cir. 2013) (quoting *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194–95 (2013)).

### A.   Existence of a Class

"Although not specifically mentioned in the rule, an essential prerequisite of an action under Rule 23 is that there must be a 'class.'" Wright & Miller, *Federal Practice & Procedure* § 1760A (3d ed. 2014); *see also Simer v. Rios*, 661 F.2d 655, 669 (7th Cir. 1981) ("it is axiomatic that for a class action to be certified a 'class' must exist"). Asking a plaintiff to demonstrate the existence of a class is a "common-sense requirement," *Bynum v. District of Columbia*, 214 F.R.D. 27, 31 (D.D.C. 2003), which clarifies whether "it is administratively feasible . . . to determine whether a particular individual is a member [of the class]." Wright & Miller, *Federal Practice & Procedure* § 1760A (3d ed. 2014). "Accordingly, a class may be certified only when 'an individual would be able to determine, simply by reading the [class] definition, whether he or she [is] a member of the proposed class.'" *Artis*, 2014 WL 4801783, at *8 (quoting *Bynum*, 214 F.R.D. at 32).

Although the District does not dispute this issue, the Court notes briefly that the classes as defined are readily ascertainable. To determine whether an individual is a member, she need only answer four objective questions: (1) whether the District "assessed a lien for an unpaid property tax deficiency" on her D.C. residential property; (2) whether the District subsequently sold a tax deed on that property; (3) whether the purchaser of that property foreclosed on and obtained title to

the property pursuant to the old tax-sale law; and (4) whether

she had equity in the property that exceeded the taxes,

interest, and related costs owed.

**B.   Rule 23(a)**

With one exception, the District concedes that the plaintiffs

satisfy Rule 23(a), which requires that:

> (1) the class is so numerous that joinder of all members
> is impracticable; (2) there are questions of law or fact
> common to the class; (3) the claims or defenses of the
> representative parties are typical of the claims or
> defenses of the class; and (4) the representative
> parties will fairly and adequately protect the interests
> of the class.

Fed. R. Civ. P. 23(a). "These requirements are known

respectively as 'numerosity, commonality, typicality, and

adequate representation.'" *Artis*, 2014 WL 4801783, at *9

(quoting *Wal-Mart*, 131 S. Ct. at 2550). The District has not

opposed the plaintiffs' contention that they satisfy the

commonality, typicality, and adequate representation

requirements.

*1.   Numerosity*

Because of the general rule in favor of confining litigation

to the named parties only, a class action is appropriate only

when "the class is so numerous that joinder of all members is

impracticable." Fed. R. Civ. P. 23(a)(1). Although commonly

called the "numerosity" requirement, "the Rule's core

requirement is that joinder be impracticable" and numerosity

merely "provides an obvious situation in which joinder may be impracticable." Newberg on Class Actions § 3:11 (5th ed. 2014). "Impracticability of joinder means only that it is difficult or inconvenient to join all class members, not that it is impossible to do so." *Bond v. Fleet Bank*, No. 1-177, 2002 WL 31500393, at *4 (D.R.I. Oct. 10, 2002); *see also Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993) ("Impracticable does not mean impossible."). Nor does the requirement provide hard rules for when joinder will be found to be impracticable; rather, it "requires examination of the specific facts of each case and imposes no absolute limitations." *Gen. Tel. Co. v. EEOC*, 446 U.S. 318, 330 (1980); *see also Taylor v. D.C. Water & Sewer Auth.*, 241 F.R.D. 33, 37 (D.D.C. 2007) (there is no "specific threshold that must be surpassed").

Despite this flexible standard, courts have developed helpful rules of thumb for assessing the approximate thresholds at which joinder becomes presumptively impracticable. Absent unique circumstances, "numerosity is satisfied when a proposed class has at least forty members." *Richardson v. L'Oreal USA, Inc.*, 991 F. Supp. 2d 181, 196 (D.D.C. 2013); *see also Alvarez v. Keystone Plus Construction Corp.*, 303 F.R.D. 152, 160 (D.D.C. 2014).[2] At the lower-end, "a class that encompasses fewer than 20

---

[2] Arguably, "as few as 25-30 class members should raise a presumption that joinder would be impracticable." *EEOC v.*

members will likely not be certified absent other indications of impracticability of joinder." Newberg on Class Actions § 3:11 (5th ed. 2014). In assessing the number of potential class members, the Court need only find an approximation of the size of the class, not "an exact number of putative class members." *Pigford v. Glickman*, 182 F.R.D. 341, 347 (D.D.C. 1998). Consistent with the Supreme Court's admonition that a plaintiff must prove compliance with Rule 23 "in fact," *Wal-Mart*, 131 S. Ct. at 2551, a plaintiff must provide some evidentiary basis beyond a bare allegation of the existence of numerous class members. The Court may, however, "draw reasonable inferences from the facts presented to find the requisite numerosity." *McCuin v. Sec'y of Health & Hum. Servs.*, 817 F.2d 161, 167 (1st Cir. 1987); *see also, e.g.*, *Houser v. Pritzker*, 28 F. Supp. 3d 222, 241 (S.D.N.Y. 2014) (a plaintiff seeking to establish numerosity "may rely on reasonable inferences from available facts").

> a.   The Class Consists of Approximately Thirty-Four
>       Potential Members

Plaintiffs asserted in their motion for class certification that over forty class members exist, relying upon "[p]ublic real estate records . . . to identify individual homeowners who have

---

*Printing Indus. of Metropolitan Washington*, 92 F.R.D. 51, 53 (D.D.C. 1981).

lost their homes in tax lien foreclosures." Mem. at 8.[3] The
District concedes that seven individuals are potential class
members, Opp. at 6, 9, 11, 14, 16, but argues that all other
individuals identified by the plaintiffs are not potential class
members for various reasons. The plaintiffs opposed most, but
not all, of these arguments, listing in their reply brief
thirty-four potential class members (not including the two named
plaintiffs). *See* Reply at 5.

   Upon review of these arguments, the Court noted that the
District's arguments seeking to remove individuals from the
class "[a]rguably . . . 'put the cart before the horse,' by
seeking an adjudication on the merits of the claims of potential
class members in an attempt to exclude them from the numerosity
analysis." Minute Order of March 12, 2015 (quoting *Amgen*, 133 S.
Ct. at 1191). The Court accordingly directed the parties to file
supplemental briefs addressing "whether some or all of the
District's arguments regarding numerosity improperly seek a
merits determination regarding the claims of potential
plaintiffs and, if so, how that impacts the numerosity issue."
*Id.*

---

[3] The plaintiffs limited their numbers to those who "lost their
real property . . . during the three years prior to the filing
of the lawsuit," but noted that "[m]any more lost their
properties prior to that period." *Id.*

In their supplemental brief, the plaintiffs assert that the
District's numerosity arguments seek improper inquiries into the
merits of potential class members' claims, rather than solely
into whether they meet the criteria for membership in the class.
*See* Pls.' Suppl. Br., ECF No. 35. The District disagrees. In so
doing, it correctly recites the law regarding the consideration
of merits issues: The Court *must* consider merits questions when
those questions overlap with Rule 23's requirements. Def.'s
Suppl. Br., ECF No. 36 at 2; *see Ellis v. Costco Wholesale
Corp.*, 657 F.3d 970, 981 (9th Cir. 2011). The District appears
not to dispute the corollary that the Court *may not* consider
merits questions that do not overlap with Rule 23's
requirements. *See D.L.*, 713 F.3d at 126. The District also
rightly notes that the Court must resolve any factual disputes
regarding the existence of a sufficiently numerous class. Def.'s
Suppl. Br., ECF No. 36 at 3; *see Wal-Mart*, 131 S. Ct. at 2551 (a
plaintiff seeking class certification "must affirmatively
demonstrate his compliance with" Rule 23, by demonstrating
compliance "in fact"). The problem, however, is that some of the
District's numerosity arguments do not raise factual disputes
about the number of potential class members; rather, they raise
merits-related defenses to their claims.

These arguments thereby stray from the purpose of the
numerosity analysis. Rule 23(a)(1) directs the Court to

determine whether the plaintiff has put forth evidence to support the existence of a sufficiently numerous class. The concern of Rule 23(a)(1), therefore, is membership in the class, not likelihood of success on the merits. *See* McLaughlin on Class Actions § 4:5 (11th ed. 2014) (the determination under Rule 23(a)(1) "does not entail an assessment of how many putative class members ultimately will have meritorious claims"). The District would have the Court remove from the calculation of the class's numbers various individuals whose claims the District contends will ultimately fail on the merits, not because those individuals do not meet the class definition, but because those individuals allegedly consented to the taking of their equity, abandoned their property interests, or have claims that are barred by *res judicata*. *See* Opp. at 4–22. Plaintiffs oppose these contentions on their merits, but the Court finds that these disputes "put the cart before the horse," *Amgen*, 133 S. Ct. at 1191, by asking how many *successful* class members exist, rather than how many *potential* class members exist.

   The Supreme Court recently addressed a similar problem in *Amgen*, where the Court found that a defendant opposing certification of a Rule 23(b)(3) class inappropriately sought to litigate a merits issue—the materiality of the defendant's alleged misrepresentation—under the guise of establishing that individual issues would overwhelm common ones for purposes of

Rule 23(b)(3)'s predominance requirement. *See id.* at 1195. The Supreme Court rejected this leap to a merits determination— whether the misrepresentation was material—that did not bear on the Rule 23 issue—whether the plaintiffs could attempt to prove materiality on a class-wide basis. *See id.*

The District seeks to import an equally incongruous merits inquiry into Rule 23(a)(1), similar to one the Seventh Circuit recently rejected. In *Parko v. Shell Oil Co.*, 739 F.3d 1083 (7th Cir. 2014), a putative class of property owners alleged that an oil refinery had "leaked benzene and other contaminants into the groundwater under the class members' homes." *Id.* at 1084. The defendant contended "that a number of the class members were not injured—either their groundwater was not contaminated by leakage from the refinery or the contamination did not affect the value of their property." *Id.* This, the defendant claimed, deprived those class members of standing, meaning that too few class members remained to support a finding of numerosity. *See id.* The Seventh Circuit held that requiring the adjudication of whether each potential class member suffered an injury "would make the class certification process unworkable; the process would require, in this case, 150 trials before the class could be certified." *Id.* at 1085. Accordingly, "[h]ow many (if any) of the class members have a valid claim is the issue to be determined *after* the class is certified." *Id.* (emphasis in

original). Or, as the Court in *Amgen* put it, the point of Rule 23 "is not to adjudicate the case; rather, it is to select the method best suited to adjudication of the controversy fairly and efficiently." 133 S. Ct. at 1191 (quotation marks and alterations omitted). Other courts have recently come to similar conclusions regarding merits arguments cloaked in numerosity garb. *See, e.g.*, *Lindh v. Warden*, No. 2:14-cv-00142, 2014 WL 7334745, at *3 (S.D. Ind. Dec. 19, 2014); *Langendorf v. Skinnygirl Cocktails, LLC*, No. 11-cv-7060, 2014 WL 5487670, at *2 (N.D. Ill. Oct. 30, 2014); *Saravia v. 2799 Broadway Grocery LLC*, No. 12-cv-7310, 2014 WL 2011720, at *3 (S.D.N.Y. May 16, 2014).

The District's arguments that certain class members have given up their Takings Clause claim by consenting to judgment in a Superior Court foreclosure action or abandoning their property such that they may not bring a Takings Clause claim, and that *res judicata* bars the claims of another are precisely the types of merits arguments that ultimately have no bearing on numerosity. Membership in the classes is not contingent upon any of these factors. They do not bear, for example, on whether individuals proffered as potential class members ever owned property in D.C., had a tax-lien sold pursuant to the relevant provision of the D.C. Code, or had their title taken in full. Rather, those arguments seek to show that the individuals'

claims will ultimately fail for lack of injury—whether due to consent to that injury, loss of the property interest that was allegedly injured, or failure to vindicate that injury in a prior proceeding in which it was required to be raised.[4] But "[h]ow many (if any) of the class members have a valid claim is the issue to be determined *after* the class is certified." *Parko*, 739 F.3d at 1085; *see also Arnold Chapman & Paldo Sign & Display Co. v. Wagener Equities, Inc.*, 747 F.3d 489, 492 (7th Cir. 2014) (noting that those who ultimately do not have a valid claim

---

[4] During oral argument, the District maintained that its arguments regarding abandonment and consent bear on whether a class member's property "included equity above the amount of real estate taxes, interest, penalties, expenses and attorney's fees at the time a tax deed was issued" as required by the class definition. *See* Mem. at 4. The argument is essentially that the alleged consent or abandonment destroyed any equity interest the individual may have had. This argument would appear to permit a court to address any defense—including the lack-of-standing defense rejected by the Seventh Circuit in *Parko*—on the theory that a successful defense would show that the class member suffered no injury. This would far exceed the case law cited by the District permitting courts to consider statute of limitations defenses or similar time-bar rules in assessing numerosity. *See Nat'l Ass'n of Gov't Emps. v. City Pub. Serv. Bd.*, 40 F.3d 698, 716 (5th Cir. 1994); *Wetzel v. Liberty Mut. Ins. Co.*, 508 F.2d 239, 246–48 (3d Cir. 1975); *Lanning v. S.E. Pa. Transp. Auth.*, 176 F.R.D. 132, 148 (E.D. Pa. 1997). As the plaintiffs noted at oral argument, such defenses may bear directly on membership in the class and do not involve the types of individualized and potentially fact-intensive decisions that the District's abandonment and consent arguments might raise, and that the standing argument raised in *Parko*. Even if, as the District suggested, these inquiries would not be nearly as in-depth as in *Parko*, they are nonetheless fact-based inquiries into the merits of a claim, not fact-based inquiries into the basis for class membership.

"just wouldn't be entitled to share in the damages awarded to the class by a judgment or settlement"). While the District's arguments may, if successful, bar certain class members from obtaining relief, that does not remove those individuals from consideration as potential members of the putative class.[5]

The District's citation to *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672 (7th Cir. 2001) is not to the contrary. In *Szabo*, the Seventh Circuit rejected a district court's decision granting class certification where "the judge assumed that whatever [the plaintiff] alleges must be true." *Id.* at 674. This approach was improper, the Seventh Circuit held, offering the following as an example:

> Before deciding whether to allow a case to proceed as a class action, therefore, a judge should make whatever factual and legal inquiries are necessary under Rule 23. This would be plain enough if, for example, the plaintiff alleged that the class had 10,000 members, making it too numerous to allow joinder, while the defendant insisted that the class contained only 10 members. A judge would not and could not accept the plaintiff's assertion as conclusive; instead the judge would receive evidence . . . and resolve the disputes before deciding whether to certify the class.

*Id.* at 676. *Szabo* stands for the uncontroversial proposition that the Court must consider merits issues and resolve fact

---

[5] The existence of such defenses could theoretically affect the analysis under other parts of Rule 23, but the District did not raise these arguments and indeed sought to downplay the extent to which these defenses would require in-depth individualized proof.

disputes *where relevant* to Rule 23 (i.e. to determine how many individuals exist that meet the class definition). *See Schleicher v. Wendt*, 618 F.3d 679, 685 (7th Cir. 2010) ("Although we concluded in *Szabo* . . . that a court may take a peek at the merits before certifying a class, *Szabo* insisted that this peek be limited to those aspects of the merits that affect the decisions essential under Rule 23").

The sole argument raised by the District that bears on any individual's membership in the classes is that some potential class members did not have equity in their property in excess of the amount of taxes, interest, and additional fees owed. *See* Opp. at 4–22.[6] The claim that certain potential class members did not have excess equity, if true, would exclude those class

---

[6] The District raised briefly the claim that certain putative class members own unimproved lots of land rather than residential property. *See* Def.'s Suppl. Br., ECF No. 36 at 4 n.3. During oral argument, the plaintiffs argued that the lots at issue are themselves residential. Plaintiffs confirmed this in a post-hearing filing, which demonstrates that all lots at issue are zoned residential. *See* Pls.' Post-Hearing Br., ECF No. 37. The Court therefore considers the owners of these lots to be "residential property owners" as relevant to the class definition.

The District also argued that one potential class member, Elizabeth Neal, is "not entitled to any equity [her] property may have had" by virtue of her estate's debt to the D.C. Department of Health. Opp. at 18–19. This debt, however, would not deprive Ms. Neal's estate of the ability to recover; to the extent she prevails and obtains damages, she may "recover the surplus equity and deal separately with the Department of Health to resolve that obligation." Reply at 10.

members from the class definition. Plaintiffs respond that the figures the District uses to assess the market value of those individuals' properties—and thereby to obtain the amount of equity—are improper measures and that a more appropriate appraisal demonstrates that the equity was much higher. *See* Reply at 7-10. Plaintiffs, moreover, have proffered appraisals that show just that. *See* Ex. A to Pls.' Mot., ECF No. 31-2. The Court thus finds that resolving any dispute over which appraisal method to use is unnecessary at this stage. Doing so would arguably seek a merits determination akin to that rejected by the Seventh Circuit in *Parko*. *See* 739 F.3d at 1085. The Court's role at this stage, moreover, is not to decide which of competing appraisal methods is appropriate; rather, the Court asks whether the plaintiffs have provided an evidentiary basis for the approximate number of potential class members whose existence they allege. *See Pigford*, 182 F.R.D. at 347. The plaintiffs' proffer of a valuation method that renders at least 34 putative class members in a position with excess equity is sufficient at this stage to justify the proposed numerosity finding. Finally, only 4 of the 34 putative class members are subject to the District's argument regarding excess equity. *See* Opp. at 7, 11, 13, 16–17, 19 (listing seven of plaintiffs' original forty class members as not having excess equity); Reply at 8–10 (counting only four of those seven to arrive at the

thirty-four member figure). Even if those 4 were removed and the Court were considering a class of 30 members, the Court would find that joinder was similarly impracticable for the reasons stated in Part III.B.1.b., *infra*.

>    b.   The Class's Unique Vulnerability Makes Joinder
>         Significantly More Difficult.

With roughly 34 potential members, plaintiffs' proposed classes are close to the range where joinder is presumed to be impracticable. To the extent that 40 members has become a precise cutoff, plaintiffs would find themselves at the high end of numerosity's gray area—where joinder is neither presumptively impracticable nor presumptively practical. Additional factors demonstrate strongly that joinder is impracticable.

The additional factors that courts consider in assessing the practicability of joinder include: (1) "judicial economy arising from avoidance of a multiplicity of actions"; (2) "geographic dispersion of class members"; (3) "size of individual claims"; (4) "financial resources of class members"; and (5) "the ability of claimants to institute individual suits." Newberg on Class Actions § 3:12 (5th ed. 2014). Where the balance of these factors "is a close call, some courts err in favor of certification because a court always has the option to decertify the class if it is later found that the class does not in fact meet the numerosity requirement." *Id.; see also J.D. v. Nagin*,

25

255 F.R.D. 406, 414 (E.D. La. 2009) (noting, in assessing
whether joinder was impracticable for a class of juveniles
incarcerated in a state facility who challenged the conditions
of their detention, that "Rule 23(a) must be read liberally in
the context of civil rights suits").

The factors that favor the District are the likelihood that
the class is geographically concentrated in Washington, D.C.,
and the related ease of identifying class members by reference
to the District's records. To be sure, courts have held that
small classes may be able to rely on joinder where class members
are geographically concentrated and their identity is readily
obtained from the defendant's records. *See, e.g.*, *Gilchrist v.
Bolger*, 89 F.R.D. 402, 410 (S.D. Ga. 1981) (class of 21 to 24
members). But these factors do not mandate a finding that
joinder is practical, especially when the potential class is
larger and other factors weigh strongly against such a finding.
Nor is this class similar to the class of twenty-eight at issue
when the D.C. Circuit affirmed the denial of class certification
in *Frazier v. Consol. Rail Corp.*, 851 F.2d 1447 (D.C. Cir.
1988). Although *Frazier* discussed geographic concentration and
the ease of identifying class members as factors counseling
against finding that joinder would be impracticable, the D.C.
Circuit emphasized that certification of classes below forty
members "is best left to the sound discretion of the district

court" and requires "an examination by the district court of the facts of each case." *Id.* at 1456 & n.10. The facts of this case render this class of approximately thirty-four much more difficult to join.

First, the vulnerability of many members of the class renders their claims uniquely unsuited for individual prosecution. Rule 23, in permitting the aggregation of claims, embodies a "principle of protection for weaker plaintiffs." *Primavera Familienstiftung v. Askin*, 178 F.R.D. 405, 411 (S.D.N.Y. 1998). In keeping with this principle, courts recognize that joinder is significantly more difficult when class members "are . . . economically disadvantaged, making individual suits difficult to pursue." *Robidoux*, 987 F.2d at 936. In such situations, a putative class action may present "an example of the 'economic reality that petitioner's suit must proceed as a class action or not at all.'" *D.L. v. District of Columbia*, 302 F.R.D. 1, 11 (D.D.C. 2013) (quoting *Eisen v. Carlisle & Jacquelin*, 317 U.S. 156, 161 (1974)) (alterations omitted); *see also McDonald v. Heckler*, 612 F. Supp. 293, 300 (D. Mass. 1985) ("These individuals claim to be disabled and of low income. It is therefore impracticable for these persons to bring individual lawsuits challenging the Secretary's policies."); *cf. Primavera*, 178 F.R.D. at 411 (finding that joinder was practical in class of "38 to 40 potential plaintiffs" in part because the class

27

members were all "sophisticated investors, with sufficient financial resources to protect their own interest," the majority of whom had "invested well over $1 million"). Similar concerns arise when other characteristics render class members vulnerable. *See, e.g.*, *D.L.*, 302 F.R.D. at 11 (class action under the Individuals with Disabilities in Education Act, which "ensures a free and appropriate education to the District's youngest and most vulnerable pupils"); *Sherman v. Griepentrog*, 775 F. Supp. 1383, 1389 (D. Nev. 1991) (relying in part on the fact that class members were largely "poor and elderly or disabled individuals"); *Rodriguez ex rel. Rodriguez v. Berrybrook Farms, Inc.*, 672 F. Supp. 1009, 1014 (W.D. Mich. 1987) (considering the "lack of formal education, English language skills, and knowledge of the legal system" of potential class members).

The members of the proposed classes in this case are, by definition, uniquely vulnerable. To be a class member, an individual must have failed to pay property taxes and failed to redeem her property during foreclosure proceedings in the Superior Court of the District of Columbia. As Mr. Coleman's and Ms. Robinson's stories demonstrate, some individuals may have found themselves in this situation due to unique vulnerabilities. Mr. Coleman ended up as a class member because he "forgot to pay a $134 real property tax bill," was "at the

time of foreclosure[,] suffer[ing] from dementia," and "was incapable of protecting his rights or managing his financial and legal affairs." First Am. Compl., ECF No. 30 ¶¶ 10–11. Similarly, "Ms. Robinson was living in a senior care facility when the tax lien was assessed against her home and later died shortly before" foreclosure proceedings began. *See id.* ¶ 10. The failure of other class members to pay their property taxes or engage in proceedings in Superior Court similarly indicates a financial vulnerability to the extent that class members were financially unable to meet their property-tax obligations or to pay the interest, penalties, and fines that were added on top of the tax obligation. It may also reflect difficulty in managing the class member's own affairs. Each of these vulnerabilities is a factor counseling in favor of finding that joinder is impracticable.

Nor is the Court barred from inferring that class members are likely vulnerable. Although the Court may not merely adopt as true a class representatives' factual allegations, *Wal-Mart*, 131 S. Ct. at 2551, courts discussing a class's vulnerability regularly make inferences that flow logically from the class definition. *See, e.g.*, *McDonald*, 612 F. Supp. at 300 (in class action challenging Social Security Administration policies "used to deny disability benefits to claimants on the grounds that their impairments are not severe," the Court inferred from the

class definition of those whose benefits claims were denied "on
the grounds that they do not have a severe impairment," that
"[t]hese individuals claim to be disabled and of low income" and
concluded that "[i]t is therefore impracticable for these
persons to bring individual lawsuits"); *D.L.*, 302 F.R.D. at 11
(in class seeking certification of claims under the Individuals
with Disabilities in Education Act, the Court noted "[t]he IDEA
ensures a free and appropriate education to the district's
youngest and most vulnerable pupils, many of whom are indigent
and unable to obtain legal services . . . . This litigation is
thus an example of the economic reality that [the] suit must
proceed as a class action or not at all") (quotation marks and
alterations omitted). It is similarly commonplace to "draw
reasonable inferences from the facts presented to find the
requisite numerosity." *McCuin*, 817 F.2d at 167.

The Court's inferences regarding the unique vulnerability of
the class are similarly derived from the class definition, as
well as the facts proffered by the plaintiffs supporting the
existence and status of each of the thirty-four potential class
members. *See* Exs. A–C to Pls.' Mot., ECF Nos. 31-2, 31-3, 31-4.
Both the class definition and these specific facts regarding the
class members demonstrate that class members, by definition and
in fact, failed to pay property taxes, had equity that exceeded
the amount they owed, and failed to redeem their property in

Superior Court or otherwise reach an arrangement under which they could extract the excess equity that they owned. It is reasonable to infer that one with the financial ability to pay the taxes or fees would pay them (after all, the equity to be saved exceeds the taxes and fees to be paid), unless the excess equity was minimal. Even one without the financial ability to pay in cash could, for example, borrow against that equity to obtain the amount of cash needed to pay the taxes and costs. An individual who is a potential class member, by definition, did not do these things to defend her interest. It is therefore reasonable to infer that some class members, if not many, lack the financial resources to prosecute their claims individually, the ability to manage their legal affairs, or both.

Not only is joinder impracticable due to these unique vulnerabilities, but joinder would also serve judicial economy by permitting the adjudication of the class's claims in one case. Where a putative class seeks damages that "flow from the resolution of a single question," considerations of judicial economy may strongly favor addressing the question at once. *Gaspar v. Linvatec Corp.*, 167 F.R.D. 51, 56–57 (N.D. Ill. 1996) (class of eighteen potential members); *see also, e.g.*, *Odom v. Hazen Transport, Inc.*, 275 F.R.D. 400, 407 (W.D.N.Y. 2011) (class of sixteen individuals). The claims in this case are

largely identical, making it economical to resolve them at once. *See* Part III.C.2.a, *infra*.

2.   *Commonality*

Next, plaintiffs must establish that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Commonality is not satisfied solely because all plaintiffs suffered "a violation of the same provision of law." *Wal-Mart*, 131 S. Ct. at 2551. The touchstone of the commonality inquiry is "the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* (quotation marks omitted; emphasis in original). Depending upon the circumstances, this may involve many common issues that together provide a resolution, but "even a single common question will do." *Id.* at 2556 (quotation marks and alterations omitted).

A class may satisfy the commonality requirement even if factual distinctions exist among the claims of putative class members. The question is "whether dissimilarities between the claims may impede a common resolution." Wright & Miller, *Federal Practice & Procedure* § 1763 (3d ed. 2014). This is less likely to occur where, as here, the class challenges a generally applicable policy or practice. *See, e.g.*, *Wal-Mart*, 131 S. Ct. at 2553–54 (noting that a plaintiff could maintain a Title VII class action by challenging a "biased testing procedure");

*Thorpe v. District of Columbia*, 303 F.R.D. 120, 145 (D.D.C. 2014) ("Where plaintiffs allege widespread wrongdoing by a defendant, a uniform policy or practice that affects all class members bridges the gap") (quotation marks and alterations omitted). Ultimately, "[w]hen the party opposing the class has engaged in some course of conduct that affects a group of persons and gives rise to a cause of action, one or more of the elements of that cause of action will be common to all of the persons affected." Newberg on Class Actions § 3:20 (5th ed. 2014).

Plaintiffs argue that their claims are susceptible to class treatment because the entire class brings the same legal claim regarding the same D.C. Code provision. *See* Mem. at 13–15. Plaintiffs' legal claims against that provision, moreover, boil down to a series of common legal questions, as this Court noted in its Opinion denying the District's motion to dismiss:

> This Court draws two clear principles from the Supreme Court's decisions in *Lawton* and *Nelson*. *Nelson* makes clear that a Takings Clause violation regarding the retention of equity will not arise when a tax-sale statute provides an avenue for recovery of the surplus equity. *Lawton* makes clear that a Takings Clause violation will arise when a tax-sale statute grants a former owner an independent property interest in the surplus equity and the government fails to return that surplus. The question Mr. Coleman's case presents is: What if the tax-sale statute does not provide a right to the surplus and the statute provides no avenue for recovery of any surplus? A property interest in equity could conceivably be created by some other legal source. In that circumstance, failure to provide an avenue for

> recovery of the equity would appear to produce a result
> identical to *Lawton*: Property to which an individual is
> legally entitled has been taken without recourse. The
> issue, then, is whether Mr. Coleman has a property
> interest in his equity and, if so, whether an
> unconstitutional taking of that property has been
> alleged.

*Coleman*, 2014 WL 4819092, at *17.

Plaintiffs therefore raise common legal questions regarding whether D.C. law creates a property interest in equity; whether the District's tax-sale statutes effect a "taking" of that property; whether any such taking was done without public purpose; and whether the plaintiffs were granted just compensation for any such taking. *See* Mem. at 14. These legal questions, moreover, are susceptible to class-wide answers because their resolution does not depend upon the particular circumstances of any individual's loss: "All putative plaintiffs are advancing the same legal theory based on the same set of facts and the same course of conduct by the District." *Hardy v. District of Columbia*, 283 F.R.D. 20, 24 (D.D.C. 2012). For this reason, the classes raise common questions, the answers to which will significantly drive the resolution of this case.

   3.   *Typicality*

Plaintiffs must also demonstrate that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The typicality requirement is concerned with whether "the named plaintiffs are

appropriate representatives of the class whose claims they wish
to litigate." *Wal-Mart*, 131 S. Ct. at 2550. A class
representative satisfies the typicality requirement if the
representative's "claims are based on the same legal theory as
the claims of the other class members" and her "injuries arise
from the same course of conduct that gives rise to the other
class members' claims." *Bynum*, 214 F.R.D. at 35. "Put another
way, a representative's claims are typical of those of the class
when '[t]he plaintiffs allege that their injuries derive from a
unitary course of conduct by a single system.'" *Artis*, 2014 WL
4801783, at *12 (quoting *Marisol A. v. Giuliani*, 126 F.3d 372,
377 (2d Cir. 1997)).

   As discussed above, the plaintiffs' claims all arise from a
common statutory background and raise identical legal questions.
*See supra* Part III.B.2. Accordingly, "the interests of the named
plaintiffs and the proposed class members are aligned because
all plaintiffs would assert the same legal claim, a taking in
contravention of the Fifth Amendment, arising out of the same
government actions." *Geneva Rock Prods., Inc. v. United States*,
100 Fed. Cl. 778, 790 (2011) (quotation marks omitted).

   Although class members may ultimately be entitled to differing
amounts of damages, this variance is not fatal to typicality,
which "may be satisfied even though . . . there is a disparity
in the damages claimed by the representative parties and the

other class members." Wright & Miller, *Federal Practice &
Procedure* § 1764 (3d ed. 2014); *see also* Newberg on Class
Actions § 3:43 (5th ed. 2014) ("Courts routinely find that the
proposed class representative's claims are typical even if the
amount of damages sought differ from those of the class or if
there are differences among class members in the amount of
damages each is claiming"). "Rule 23 contains no suggestion that
the necessity for individual damage determinations destroys . .
. typicality." *Gunnells v. Healthplan Servs.*, 348 F.3d 417, 427–
28 (4th Cir. 2003). Accordingly, courts certify classes whose
damages claims, for example "may be determined by examining the
same electronic databases." *Ramos v. SimplexGrinnell LP*, 796 F.
Supp. 2d 346, 357 (E.D.N.Y. 2011), *vacated in part on other
grounds*, 773 F.3d 394 (2d Cir. 2014). Damages would be similarly
discernible here. *See infra* Part III.C.2.a.

Nor do there appear to be any unique defenses to the claims of
either named plaintiff that might destroy typicality. Such
defenses are found only in narrow circumstances: "The critical
question for the Court is not whether these defenses are legally
viable, but rather, assuming they are supportable, whether they
would 'skew the focus of the litigation and create a danger that
absent class members will suffer because their representative is
preoccupied with defenses unique to it.'" *Thorpe*, 303 F.R.D. at
149-50 (quoting *Meijer, Inc. v. Warner Chilcott Holdings Co.*

*III*, 246 F.R.D. 293, 302 (D.D.C. 2007)) (alteration omitted). Although the District has alluded to a potential statute of limitations defense to Mr. Coleman's claims, there appears to be no such defense to the claims of Ms. Robinson's estate. In any event, statute-of-limitations defenses are unlikely to skew the focus of litigation. *See, e.g.*, *Sykes v. Mel Harris & Assocs.*, 285 F.R.D. 279, 292 (S.D.N.Y. 2012) (statute-of-limitations defense applicable to some named plaintiffs did not "threaten to become the focus of the litigation"). Similarly, the District's abandonment, consent-to-judgment, and *res judicata* arguments— which it raised only in connection with the numerosity factor— are relatively small issues, and the Court has no reason to believe that they will become the focus of litigation to the detriment of the claims of other class members or that they would be ignored if they are not raised against the named plaintiffs. Accordingly, Mr. Coleman and Ms. Robinson's Estate have claims that are typical of those of the class they seek to represent.

### 4.   *Adequate Representation*

The final requirement of Rule 23(a) is that "the representative parties will fairly and adequately protect the interests of the class." This ensures that "the named representative must not have antagonistic or conflicting interests with the unnamed members of the class," and "the

representative must appear able to vigorously prosecute the interests of the class through qualified counsel." *Twelve John Does v. District of Columbia*, 117 F.3d 571, 575 (D.C. Cir. 1997) (quotation marks omitted). The proposed class representatives are capable of "fairly and adequately protect[ing] the interests of the class." Fed. R. Civ. P. 23(a)(4). Plaintiffs seek identical relief for all class members, so there are no conflicting interests that might derail certification on this prong. The District, moreover, does not challenge, and there is no reason to doubt, that the proposed class representatives are able to prosecute the interests of the class through the counsel they have chosen, who have extensive experience with class-action litigation. *See id.* at 17.

**C.   Rule 23(b)**

Having demonstrated that their proposed classes satisfy the threshold requirements of Rule 23(a), plaintiffs must also show that each class can be maintained as one of three types of class actions listed in Rule 23(b). Plaintiffs seek to bring the Declaratory Relief Class under Rule 23(b)(2), and the Damages Class under Rule 23(b)(3).

*1.   The Declaratory Relief Class May Be Certified Pursuant to Rule 23(b)(2)*

A (b)(2) class may be certified where "the party opposing the class has acted or refused to act on grounds that apply

generally to the class, so that final injunctive relief or
corresponding declaratory relief is appropriate respecting the
class as a whole." Fed. R. Civ. P. 23(b)(2). "The key to the
(b)(2) class is the indivisible nature of the injunctive or
declaratory remedy warranted—the notion that the conduct is such
that it can be enjoined or declared unlawful only as to all of
the class members or as to none of them." *Wal-Mart*, 131 S. Ct.
at 2557 (quotation marks omitted).

To determine whether the District has treated the class on
generally applicable grounds, "[t]he key is whether the party's
actions would affect all persons similarly situated so that
those acts apply generally to the whole class." Wright & Miller,
*Federal Practice & Procedure* § 1775 (3d ed. 2014). The District
has not opposed plaintiffs' allegations that they meet this
standard. Plaintiffs challenge the District's admitted practice—
codified in the D.C. Code—of selling the right to foreclose
entirely on a property owner's right of redemption and thereby
to take the entirety of the property owner's equity. This legal
provision affected all class members in the same way.

The second requirement of Rule 23(b)(2) is that plaintiffs
seek "final injunctive relief or corresponding declaratory
relief . . . respecting the class as a whole." Fed. R. Civ. P.
23(b)(2). The District does not dispute that the declaratory
relief sought by the class meets this criterion. Accordingly,

the Declaratory Relief Class may be certified under Rule 23(b)(2).

> 2.   *The Damages Class May Be Certified Pursuant to Rule 23(b)(3)*.

A (b)(3) class may be certified where "the questions of law or fact common to class members predominate over any questions affecting only individual members" and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). These requirements are referred to respectively as "predominance and "superiority." *Barnes v. District of Columbia*, 242 F.R.D. 113, 123 (D.D.C. 2007).

> a.   Predominance

The predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods. v. Windsor*, 521 U.S. 591, 623 (1997). This inquiry is similar to the commonality inquiry, but "[i]f anything . . . is even more demanding." *Comcast*, 133 S. Ct. at 1432. "[T]he predominance analysis logically entails two distinct steps—the characterization step and the weighing step." Newberg on Class Actions § 4:50 (5th ed. 2014).

First, the court must "characterize the issues in the case as common or individual." *Id.* (emphasis omitted). This determination is "primarily based on the nature of the

40

evidence." *Id.* "Evidence is considered 'common' to the class if
the same evidence can be used to prove an element of the cause
of action for each member." *Kottaras v. Whole Foods Market,
Inc.*, 281 F.R.D. 16, 22 (D.D.C. 2012). By contrast, evidence is
individualized when "members of the proposed class would need to
present evidence that varies from person to person." *Id.*

   Second, the Court must "compare the issues subject to common
proof against the issues subject solely to individualized proof
to assess whether the common issues predominate." Newberg on
Class Actions § 4:50 (5th ed. 2013). This comparison is "a
qualitative rather than a quantitative concept." *Parko*, 739 F.3d
at 1085. "[T]he common issues do not have to be shown to be
dispositive." *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251,
262 (D.D.C. 2002); *see also Amgen*, 133 S. Ct. at 1191 ("Rule
23(b)(3) requires a showing that *questions* common to the class
predominate, not that those questions will be answered, on the
merits, in favor of the class.") (emphasis in original).

   At the weighing step, the Court must keep in mind that "common
liability issues are typically far more important and contested
and the individual damage calculations often formulaic." Newberg
on Class Actions § 4:54 (5th ed. 2014); *see also In re Nexium
Antitrust Litig.*, 777 F.3d 9, 21 (1st Cir. 2015) ("Where common
questions predominate regarding liability, then courts generally
find the predominance requirement to be satisfied even if

individual damages issues remain.") (quotation marks and alteration omitted). The D.C. Circuit has agreed "that the mere fact that damage awards will ultimately require individualized fact determinations is insufficient by itself to preclude class certification." *McCarthy v. Kleindienst*, 741 F.2d 1406, 1415 (D.C. Cir. 1984); *see also* Newberg on Class Actions § 4:54 (5th ed. 2014) ("courts in every circuit have uniformly held that the 23(b)(3) predominance requirement is satisfied despite the need to make individualized damage determinations").[7]

---

[7] This general rule remains valid in the wake of the Supreme Court's decision in *Comcast*, which involved a "straightforward application of class-certification principles" to hold that predominance may not be established unless the "model purporting to serve as evidence of damages . . . measure[s] only those damages attributable to" the plaintiff's theory of liability. 133 S. Ct. at 1433. Indeed, the Supreme Court had recognized only two years earlier that "individualized monetary claims belong in Rule 23(b)(3)." *Wal-Mart*, 131 S. Ct. at 2558. To read *Comcast* more broadly would not only be incorrect:

> It would drive a stake through the heart of the class action device, in cases in which damages were sought rather than an injunction or a declaratory judgment, to require that every member of the class have identical damages. If the issues of liability are genuinely common issues, and the damages of individual class members can be readily determined in individual hearings, in settlement negotiations, or by creation of subclasses, the fact that damages are not identical across all class members should not preclude class certification. Otherwise defendants would be able to escape liability for tortious harms of enormous aggregate magnitude but so widely distributed as not to be remediable in individual suits.

*Butler v. Sears, Roebuck & Co.* 727 F.3d 796, 801 (7th Cir. 2013); *see also, e.g.*, *Roach v. T.L. Cannon Corp.*, 778 F.3d 401,

As discussed, the plaintiffs raise common legal questions regarding their liability claims. *See supra* Part III.B.2. These common questions, which comprise nearly the entirety of the class's liability claim, are themselves sufficient to support a finding that common issues predominate over individualized ones.

The District argues only that the individualized nature of the calculation "of each class member's property value at the time the tax deed was issued will require individual treatment." Opp. at 24-25. This, the District claims, inserts an individualized issue not only into the calculation of the damages owed each class member, but also to the proof whether the class member "had equity in the property that could qualify as an alleged taking." *Id.* at 25. Although the District is correct at the first step of the predominance analysis—that proof of the value of a particular class member's property will be individualized—a number of factors render that issue a minor part of the otherwise strikingly common class claims, so the District's argument must fail at the second step.

---

405 (2d Cir. 2015) (*Comcast* did not displace the Second Circuit's long-established rule that "the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification under Rule 23(b)(3)") (quotation marks omitted); *In re Deepwater Horizon*, 739 F.3d 790, 815 (5th Cir. 2014) (*Comcast* "has no impact on cases . . . in which predominance was based not on common issues of damages but on the numerous common issues of liability").

First, the valuation issue may be provable by the District's

own existing property valuations, making it subject to efficient

proof of a more common nature (i.e. proof based upon a

preexisting record that was compiled pursuant to a common

methodology). As the plaintiffs note, the District regularly

assesses the value of properties within its borders in

calculating property taxes. *See* Mem. at 20. These assessments

provide a preexisting uniform source for the value of each

property—the calculation of which the District contends is so

individualized that class treatment is unwarranted. Indeed, the

District's Office of Tax and Revenue has made several assertions

that support the utility of these figures as a proxy for market

value.[8] There is thus a common basis for potential resolution of

---

[8] The Office asserts that its assessments reflect "the estimated market value of your property," which it defines as "the most probable price for which you can sell your property given normal terms and conditions of sale." *Real Property Assessments and Appeals FAQs*, D.C. Office of Tax and Revenue, http://otr.cfo.dc. gov/page/real-property-assessments-and-appeals-faqs (last visited April 13, 2015). It also touts the "substantial improvements" it has made to the assessment process "to provide the most equitable and uniform assessments possible," and claims that the Office prepares reports to "measure[] assessment quality by looking at the most recent assessment program and comparing the results of that effort to actual market conditions." *Real Property Assessment Process*, D.C. Office of Tax and Revenue, http://otr.cfo.dc.gov/node/388692 (last visited April 13, 2015). The latest such report claims that "[t]he data show that the District has acceptable levels and uniformity of assessments" and that a comparison of assessments to real market sales prices demonstrated that "values determined by appraisers for the most recent valuation attained a uniform and appropriate level of value." Real Property Tax Administration, D.C. Office

the valuation issue, without the need for any individualized proof beyond references to the District's calculations.

The District, in response, questions the validity and utility of its own appraisals. *See* Opp. at 25. Assuming without deciding that the District would prevail on this argument, the District offers no explanation of why conducting new appraisals would overwhelm the otherwise common issues in the case. Indeed, the District did not respond to the assertion in plaintiffs' motion that "new appraisals could be conducted using common, standard appraisal methods across the class." Mem. at 22. At least one court has certified a (b)(3) class despite the need for similar appraisals. *See Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597, 607 n.5 (E.D. La. 2006) (class "presented evidence that certain elements of their alleged damages may be assessed on a class-wide basis," one of which was that "the properties at issue would be properly subject to mass appraisal to determine their present value"). Nor is it uncommon to certify a (b)(3) class despite the need for other types of individualized calculations, especially where the formula and method for conducting the calculation is itself common. *See, e.g.*, *Ward v. Dixie Nat'l Life Ins. Co.*, 595 F.3d 164, 169, 180 (4th Cir. 2010) (where

---

of Tax and Revenue, FY 2015 Assessment Ratio Report 2, 8 (2015), *available at* http://otr.cfo.dc.gov/sites/default/files/dc/sites/otr/publication/attachments/2015RPTASalesRatioReportFinal.pdf (last visited April 13, 2015).

liability issues were largely common, predominance was met even though damages were individualized because "the formula for damages was identical for all class members"); *Ramos*, 796 F. Supp. 2d at 359 ("True, the putative class members earned prevailing wages at different rates, some worked more hours than others, and some are electricians and others are sprinkler fitters. However, these differences do not predominate over the main issue: whether defendant systematically failed to pay its employees the prevailing wages due them.").

The predominance requirement is therefore met because the class challenges a "generalized practice," the "central element of Plaintiffs' theory of liability . . . is common to every class member," and "even the minor differences between the class members—such as the amount of total damages—are susceptible to generalized proof since a common formula is used to calculate the individual damages." *Alvarez*, 303 F.R.D. at 162. Even if the valuation issue were entirely individualized, "this single fact would not preclude a finding that common questions of law and fact predominate over individual questions." *Bynum*, 214 F.R.D. at 39.[9] Accordingly, even if the District is correct that its own

---

[9] Nor would any defense related to the statute of limitations prevent the class from meeting the predominance requirement. "Statute of limitations defenses . . . rarely defeat class certification." Newberg on Class Actions § 4:57 (5th ed. 2014); *see also Hoxworth v. Blinder, Robinson & Co.*, 980 F.2d 912, 924 (3d Cir. 1992) ("Courts have been nearly unanimous . . . in

appraisals should not be used, the common liability and damages issues will predominate over the single individualized issue of calculating appraisals for each class member's property pursuant to a common calculation method.

> b.   Superiority

The superiority requirement is intended to "ensure[] that resolution by class action will 'achieve economies of time, effort, and expense and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable consequences." *Vista Healthplan, Inc. v. Warner Holdings Co.*, 246 F.R.D. 349, 359-60 (D.D.C. 2007) (quoting *Amchem*, 521 U.S. at 615) (alteration in original). The Rule directs the Court to

---

holding that possible differences in the application of a statute of limitations to individual class members, including the named plaintiffs, does not preclude certification of a class action") (quotation marks omitted). This is so because even when they are individualized, "courts deem that these concerns can be resolved during the damage phase of the case and need not preclude certification of liability issues." Newberg on Class Actions § 4:57 (5th ed. 2014); *see also Waste Mgmt. Holdings v. Mowbray*, 208 F.3d 288, 296 (1st Cir. 2000) ("As long as a sufficient constellation of common issues binds class members together, variations in the sources and application of statutes of limitations will not automatically foreclose class certification under Rule 23(b)(3)."). To the extent the District raises such a defense as to the claims of some class members, that defense can be adjudicated separately during the damages phase of this case. For similar reasons, the potential abandonment, consent-to-judgment, and *res judicata* defenses—raised by the District only in connection with the numerosity analysis—form minor issues that would not upset the predominance of common liability issues.

consider, in analyzing the alternatives to class-action treatment, the following factors: "the class members' interests in individually controlling the prosecution or defense of separate actions; the extent and nature of any litigation concerning the controversy already begun by or against class members; the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3). Although the District's opposition to the motion for class certification stated that "several pertinent factors indicate that class certification is not superior," it did not enumerate these factors or otherwise address the superiority issue. *See* Opp. at 24–25.

A class action is superior when it "may forestall an inefficient and uneconomical flood of individual lawsuits and/or prevent inconsistent outcomes in like cases." Newberg on Class Actions § 4:67 (5th ed. 2014). This is an especially powerful concern when, as here, common issues predominate strongly. "If there are genuinely common issues, issues identical across all the claimants, issues moreover the accuracy of the resolution of which is unlikely to be enhanced by repeated proceedings, then it makes good sense, especially when the class is large, to resolve those issues in one fell swoop." *Mejdrech v. Met-Coil Systems Corp.*, 319 F.3d 910, 911 (7th Cir. 2003). In these

48

situations, it is reasonable to assume that "the class members' interests in individually controlling the prosecution or defense of separate actions" are limited because their "claims may be so closely related to the claims of others that litigation by others will achieve their ends without the need for their involvement." Newberg on Class Actions § 4:69 (5th ed. 2014).

Superiority is also often found when use of the class action device would "enable[] 'vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all.'" *Id*. § 4:65 (quoting *Amchem*, 521 U.S. at 617). In such circumstances, "[m]ultiple lawsuits would be costly and inefficient, and the exclusion of class members who cannot afford separate representation would be neither fair nor an adjudication of their claims." *In re Auction Houses Antitrust Litig.*, 193 F.R.D. 162, 168 (S.D.N.Y. 2000) (quotation marks omitted).

Essentially every liability issue in this case is common, with the exception of the valuation of individual properties. *See supra* Part III.C.2.a. The 34 class members in this case, by definition, have less financial resources, a lesser ability to manage their legal affairs, or both, than the average citizen. *See supra* Part III.B.1.b. In the absence of a class action, then, class members are less likely to be able to prosecute separate actions, and if they were to do so, would face

inefficient resolution of 34 disputes that are largely identical to the disputes presented by Mr. Coleman and Ms. Robinson's Estate. Accordingly, this case is a prime candidate for the use of a (b)(3) class to handle more efficiently all common claims.

The other factors enumerated in Rule 23(b)(3) do not weigh heavily against the use of a class action. The parties have alerted the Court to no other litigation regarding this subject matter.[10] If anything, the desirability of concentrating the litigation in a particular forum counsels in favor of a class action, because the relevant actions necessarily occurred in the District and the defendant is located here. Nor is there any risk that the classes will be particularly unmanageable, given the extent to which class members raise common issues.

## IV.  Conclusion

For the foregoing reasons, the Court hereby **GRANTS** plaintiffs' motion for class certification. An appropriate Order accompanies this Memorandum Opinion.

**SO ORDERED.**

**Signed:     Emmet G. Sullivan**
**            United States District Judge**
**            April 13, 2015**

---

[10] That others may be litigating cases against the private entity that bought their tax lien and ultimately instituted the foreclosure does not bear on this question, which asks whether there is other litigation regarding the issue raised in this case—a Takings Clause claim against the District of Columbia for the taking of excess equity.